[No. 45623-7-I. Division One. April 2, 2001.]

CONNIE HAUBRY, *Appellant*, v. LAWRENCE W. SNOW, ET AL., *Respondents*.

*Jay R. Stephens* (of *The Stephens Law Firm, P.S.*), for appellant.

*Russell L. Perisho* and *Sonja L. Lengnick* (of *Perkins Coie, L.L.P.*), for respondents.

GROSSE, J. — Connie Haubry appeals the summary judgment in favor of her former employer Dr. Lawrence W. Snow and his medical corporations on her claims of sexual harassment; disparate treatment discrimination; constructive discharge; negligent infliction of emotional distress; intentional infliction of emotional distress; and negligent hiring, supervision, and retention. We find that Haubry established sufficient material facts to support the elements of her sexual harassment and constructive discharge claims and therefore reverse the decision of the trial court as to those claims. The remainder of the trial court's decision is affirmed.

## STANDARD OF REVIEW

This is an appeal from an order granting summary

judgment. Review is therefore de novo and this court engages in the same inquiry as the trial court.[1] That inquiry is whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law.[2] The court considers the evidence and the reasonable inferences therefrom in a light most favorable to the nonmoving party. Because the trial court granted summary judgment in favor of Dr. Snow, this court will take the facts alleged by Haubry to be true. If there is a dispute as to any material fact, then summary judgment was improper. However, if reasonable minds could reach but one conclusion from the admissible facts in evidence, summary judgment is proper.[3]

■ In order for a plaintiff alleging discrimination in the workplace to overcome a motion for summary judgment, he or she must do more than express an opinion or make conclusory statements. The plaintiff must establish specific and material facts to support each element of his or her prima facie case.[4]

## FACTS

Haubry began her employment with Dr. Snow on May 3, 1995 as a check-in receptionist. Her time was originally shared between two of Dr. Snow's offices in Renton and Auburn, Washington. During her first month of employment, Haubry remembers two distinct occasions where she believes and contends that Dr. Snow looked at her in an offensive way. She described the look as not looking at her face but at her body, starting at her shoulders and going down to her feet, with a focus on her breasts. Dr. Snow would stare at her for long periods of time which Haubry

---

[1] *DeWater v. State*, 130 Wn.2d 128, 133, 921 P.2d 1059 (1996); *Marquis v. City of Spokane*, 130 Wn.2d 97, 104-05, 922 P.2d 43 (1996); *see also Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000).

[2] *DeWater*, 130 Wn.2d at 133; *Marquis*, 130 Wn.2d at 105.

[3] CR 56(c); *LaMon v. Butler*, 112 Wn.2d 193, 199, 770 P.2d 1027 (1989).

[4] *Hiatt v. Walker Chevrolet Co.*, 120 Wn.2d 57, 66-67, 837 P.2d 618 (1992).

found offensive and which made her very uncomfortable. Haubry stated she did not say anything because she was afraid of losing her job. She indicated that had she been writing down the occurrences of Dr. Snow's leering, it would have been almost every day that she was in his presence.

Several times in the first months of her employment, Dr. Snow would approach Haubry from behind and place his hands on top of her shoulders. Haubry found this touching offensive and it made her feel uncomfortable. On July 11, 1995, while seated in her chair at work, Dr. Snow came up to her, sat down beside her, turned her chair around so they were sitting face to face and knees to knees, and started a conversation about a scheduling error. While he was talking, and without her consent, Dr. Snow placed his hands on her knees and then began to rub the tops of her legs. At the time Haubry was wearing blue slacks with a thin mauve pinstripe which matched her mauve blouse. Dr. Snow took his finger, placed it on one of the pinstripes, and followed it up to the top of her thigh while he commented on how well the pinstripes matched her blouse. He continued by touching her blouse at a point just above her waist. This upset Haubry as she considered it to be a sexual advance. She began to keep track of Dr. Snow's conduct and told a co-worker, Jolene Hannahs, of the incident.

Following this incident, Haubry began placing a file cart beside her at work to provide a barrier. She arranged for Hannahs to take any messages into Dr. Snow's office or examining room. She made every effort to minimize her contact with Dr. Snow. She noted the offensive and leering stares from Dr. Snow about once a week through July, August, and September of 1995.

On September 8, 1995, Haubry was standing next to a file cabinet. Dr. Snow approached her from behind, put his hands on her waist, pushed himself in towards her, and commented on her outfit in what Haubry believed to be a sexual tone. Haubry stated she became sick to her stomach and she immediately told Hannahs about the incident. Haubry and Hannahs arranged their lunch hours so that

Haubry would not be left alone with Dr. Snow at any time.

On December 20, 1995, Dr. Snow approached Haubry from behind while she was standing on a stool. He put his hands on her waist and gave her a quick squeeze, shocking Haubry and causing her to pass gas. She jumped off the stool and yelled at Dr. Snow, telling him that he had frightened her and to never do it again. Dr. Snow walked away, but Haubry felt humiliated and embarrassed. Allan Strom, a physician's assistant, stated he saw the incident and there was no reason for Dr. Snow to put his hands on her. He stated that Dr. Snow had never come up to him and placed his hands on his waist. Haubry told Strom that Dr. Snow's conduct was inappropriate and she did not like it. She told Strom that Dr. Snow had previously touched her about the knees and thighs and she did not like it. Haubry called the King County Sexual Assault Unit, which in turn sent her pamphlets on sexual harassment in the workplace. She was given the number of the State Human Rights Commission.

On March 6, 1996, Haubry was at work, wearing a pair of tan suede slacks with a matching suede vest. Dr. Snow approached and asked, "What poor cow did you have to kill to get your way for these pants?" As he made this comment, Dr. Snow placed his hands on the right side of Haubry's leg and moved his hand up her thigh, around her buttocks, with his hands ending up between her legs and crotch area. Haubry stood still momentarily and then moved away.

Thereafter, Haubry continued to use a file cart to block her work area from Dr. Snow. She made certain she was not left alone with him. She had her boyfriend call her between certain hours so Dr. Snow could not talk to her as he left the office. She was actively seeking different employment.

In April 1996, Haubry wore a white and floral summer dress. Dr. Snow made a comment about the dress and looked at her with what she described as a "demeaning, lustful, leering, and humiliating look."

On May 3, 1996, Haubry found it necessary to forward a

message to Dr. Snow. As she was standing at a counter, Dr. Snow came out of another room. He stood behind her and pressed himself into her. While doing this, Dr. Snow placed his hands on her arms and she felt his whole body press against hers. Haubry felt this was an unwarranted and unwanted sexual advance. Dr. Snow continued with his leering and unwelcome looks.

Haubry felt her work was being adversely affected by the environment created by Dr. Snow. She was on edge and had difficulty concentrating. She suffered sleepless nights, particularly when she knew Dr. Snow was coming into her workplace the following day, or after a work day wherein he had been particularly leering. She had nightmares about being locked in a small room, unable to get out. She developed a fear of people standing behind her or approaching her unexpectedly.

Toward the end of the summer of 1996, Dr. Snow told Haubry that if she wanted a great orgy, she should go to the Black Diamond Bakery and have a cinnamon roll. Dr. Snow admitted making this comment but with reference to the bakery's cinnamon rolls which were tasty and very pleasurable. He admitted the comment may have been somewhat inappropriate.

Following this comment, Haubry indicated that Dr. Snow's leering looks continued each day she worked with him. She finally left Dr. Snow's employment because she was so uncomfortable working in the office when he was present.

Haubry is not the only female employee who allegedly has been treated in the same fashion by Dr. Snow. There were affidavits from other former employees who had similar experiences or had observed inappropriate behavior by Dr. Snow. Haubry left her employment with Dr. Snow for another job. Shortly thereafter, she was unemployed for a while before she found additional employment.

On October 22, 1999, the trial court entered an order granting in part and denying in part Dr. Snow's motion for

summary judgment. The trial court dismissed the claims for hostile work environment finding that Haubry had not set forth sufficient facts to establish the severe and pervasive conduct necessary to support such a claim. The trial court found that only two of the alleged events raised a degree of concern and that they could form the basis for the intentional infliction of emotional distress. The trial court determined that there was insufficient support for her remaining claims. Subsequently, on Dr. Snow's motion for reconsideration, the trial court dismissed the intentional infliction claim as well, based on the court's reading of *Hegel v. McMahon.*[5] From these orders, Haubry appeals.

## DISCUSSION

■ We review the trial court's determination that Haubry's claims were insufficient as a matter of law.

### 1. Sexual harassment/hostile work environment

■ Sex discrimination in employment is prohibited by this state's Law Against Discrimination, chapter 49.60 RCW (WLAD). It declares the right to be free from discrimination on the basis of race, creed, color, national origin, sex, marital status, age, or disability to be a civil right.[6] The Supreme Court of this state has interpreted this section of the statute as prohibiting sexual harassment in employment.[7] In *Glasgow v. Georgia-Pacific Corp.*, the court held that plaintiffs' allegations that their employer implicitly, but effectively, made their endurance of sexual intimidation a term or condition of employment were actionable under chapter 49.60 RCW.[8] The *Glasgow* court stated: "Sexual harassment as a working condition unfairly handicaps an employee against whom it is directed in his or her work

---

[5] *Hegel v. McMahon*, 136 Wn.2d 122, 960 P.2d 424 (1998).

[6] RCW 49.60.010, .030(1), RCW .180(2), (3).

[7] Additionally, because the State discrimination laws substantially parallel Title VII, the court may look to federal law for guidance. *Xieng v. Peoples Nat'l Bank*, 120 Wn.2d 512, 518, 844 P.2d 389 (1993).

[8] *Glasgow v. Georgia-Pacific Corp.*, 103 Wn.2d 401, 405, 693 P.2d 708 (1985).

performance and as such is a barrier to sexual equality in the workplace."[9]

■■ To establish a hostile work environment case, the employee must prove (1) the harassment was unwelcome; (2) the harassment was because of sex; (3) the harassment affected the terms or conditions of employment; and (4) the harassment is imputed to the employer.[10] Only the second and third elements are at issue here. Dr. Snow contends Haubry failed to show that his alleged conduct was based on her gender. He claims that the vast majority of the incidents claimed by Haubry were objectively innocuous at best, and provide no evidence that he intended his comments or conduct to be perceived in a sexual manner. Contrary to the argument of Dr. Snow, and the decision of the trial court, taking the facts as set forth by Haubry viewed in her favor as required under the summary judgment standard, Haubry has presented sufficient evidence to raise an issue of material fact as to whether Dr. Snow's actions were based on her sex and/or gender. This is especially true considering the affidavits of other women who worked for Dr. Snow. Additionally, at least one male employee stated in his affidavit that he was never approached or touched in the same manner as Dr. Snow touched Haubry or other women in his employ.

■ Dr. Snow claims that Haubry cannot show the third element, a severe or pervasive harassment that is legally sufficient to alter the conditions of employment and create an abusive working environment. To determine whether the harassment affected the conditions of employment, the court considers the " 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

---

[9] *Glasgow*, 103 Wn.2d at 405; *see also DeWater*, 130 Wn.2d at 134; *Payne v. Children's Home Soc'y of Wash., Inc.*, 77 Wn. App. 507, 511, 892 P.2d 1102 (1995).

[10] *Glasgow*, 103 Wn.2d at 406-07.

unreasonably interferes with an employee's work performance.' "[11]

■ The *Glasgow* court indicated that whether the harassment at the workplace is sufficiently severe and persistent to seriously affect the emotional or psychological well being of an employee is a question to be determined with regard to the totality of the circumstances. While isolated incidents may not amount to discriminatory changes in the terms and conditions of employment,[12] Haubry indicated that she used file carts to act as a barrier between her and Dr. Snow; arranged her lunch hour so she would not be alone with Dr. Snow in the office; and she lost sleep and was often sick to her stomach due to his actions. Although more subjective in nature, she claims Dr. Snow's leering was a constant with which she had to endure from the beginning of her employment to the time she quit. These claims of leering were substantiated by the affidavits of other women who had been in Dr. Snow's employ as well. Although it may be difficult to prove at trial, Haubry has presented sufficient evidence of this claim to survive summary judgment.

2. Disparate treatment discrimination

■ Haubry argues that the trial court erred in summarily dismissing her disparate treatment discrimination claim. Even if sexual harassment is not present, sexual discrimination can be proven by showing disparate treatment of males and females. When a disparate treatment claim is brought by a woman against her employer, she must show that the employer treated her differently from similarly situated men.[13] Haubry must establish a prima facie case by presenting facts that she (1) is a member of a protected class (i.e., is a woman); (2) was discharged (or constructively discharged); (3) was replaced by a person

---

[11] *Sangster v. Albertson's, Inc.*, 99 Wn. App. 156, 163, 991 P.2d 674 (2000) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).

[12] *See MacDonald v. Korum Ford*, 80 Wn. App. 877, 886, 912 P.2d 1052 (1996); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

[13] *Schonauer v. DCR Entm't, Inc.*, 79 Wn. App. 808, 826, 905 P.2d 392 (1995); *Ellingson v. Spokane Mortgage Co.*, 19 Wn. App. 48, 54, 573 P.2d 389 (1978).

outside the protected group (i.e., a man); and (4) was qualified to do the job.[14] Haubry's ultimate burden is to show that gender was a "substantial factor" in the employer's adverse employment decision.[15] Haubry has provided no evidence that she was replaced by a male receptionist or that Dr. Snow had any male receptionists. There is no way for a jury to compare her situation with that of similarly situated men. Further, most disparate treatment cases are based on employment decisions discharging or terminating a woman who is then replaced by a man. Any discharge here would have been a constructive discharge. That claim is better left for a jury than one of disparate treatment discrimination. The facts here do not support a claim for disparate treatment discrimination, and this claim was properly dismissed.

3. Constructive discharge

Haubry contends the trial court erred by dismissing her claim of constructive discharge against Dr. Snow. To establish a claim of constructive discharge, Haubry must prove that Dr. Snow deliberately made working conditions intolerable for her; that a "reasonable person in her position" would be forced to quit; that she did quit because of the conditions and not for any other reason; and that she suffered damage as a result of being forced to quit.[16] The question of whether the working conditions were intolerable is one for the trier of fact, unless there is no competent evidence to establish a claim of constructive discharge.[17] The intolerable element may be shown by aggravated circumstances or a continuous pattern of discriminatory treatment. Here, contrary to the decision of the trial court and contrary to the arguments made by Dr.

[14] *Schonauer*, 79 Wn. App. at 826 (citing *Kastanis v. Educ. Employees Credit Union*, 122 Wn.2d 483, 490, 859 P.2d 26, 865 P.2d 507 (1993)).

[15] *Mackay v. Acorn Custom Cabinetry, Inc.*, 127 Wn.2d 302, 310, 898 P.2d 284 (1995).

[16] *Hill v. GTE Directories Sales Corp.*, 71 Wn. App. 132, 143, 856 P.2d 746 (1993) (citing *Bulaich v. AT&T Info. Sys.*, 113 Wn.2d 254, 258-60, 778 P.2d 1031 (1989)).

[17] *Sneed v. Barna*, 80 Wn. App. 843, 849, 912 P.2d 1035 (1996).

Snow, Haubry presented evidence supporting these elements sufficient to avoid summary judgment. There is at least a question of material fact as to whether the workplace situation into which Haubry was placed would compel a reasonable person to resign. While it may be a difficult burden for Haubry to prove that the conditions were "intolerable" at trial, the evidence is sufficient to avoid a summary judgment dismissal of the constructive discharge claim.

4. Negligent infliction of emotional distress

 Haubry asserts the trial court committed error by dismissing her claim for negligent infliction of emotional distress. A plaintiff alleging negligence must establish a duty, a breach, proximate cause, and damage or injury.[18] An employee may recover damages for emotional distress in an employment context but only if the factual basis for the claim is distinct from the factual basis for the discrimination claim.[19] Here, there is no separate compensable claim because the factual basis for the emotional distress claim is the same as the sexual harassment or discrimination claim. It is true that an employer may be held responsible when his negligent acts injure an employee, and such acts are not in the nature of employee discipline, and further do not give rise to a cognizable Industrial Insurance Act claim. But a claim arises only when the claim is based on a separate factual basis from the sexual discrimination claim.

Even if Haubry somehow based her claim on separate facts, the claim is subject to certain limitations. A claim for the negligent infliction of emotional distress also requires that Haubry establish that the emotional distress is manifested by objective symptoms.[20] To satisfy the objective symptomatology requirement established in the case of *Hunsley v. Giard*, Haubry's emotional distress must be

---

[18] *Hunsley v. Giard*, 87 Wn.2d 424, 434, 553 P.2d 1096 (1976).

[19] *Chea v. Men's Wearhouse, Inc.*, 85 Wn. App. 405, 412, 932 P.2d 1261, 971 P.2d 520 (1997); *see also Johnson v. Dep't of Soc. & Health Servs.*, 80 Wn. App. 212, 230, 907 P.2d 1223 (1996).

[20] *Hunsley*, 87 Wn.2d at 436; *see also Hegel*, 136 Wn.2d at 132.

susceptible to medical diagnosis and proved through medical evidence.[21] Under *Hegel v. McMahon*, nightmares, sleep disorders, intrusive memories, fear and anger, such as Haubry has claimed existed, may in fact be sufficient. "However, in order for these symptoms to satisfy the objective symptomatology requirement, they must constitute a diagnosable emotional disorder."[22] Thus, there must be objective evidence regarding the severity of the distress and the causal link between the actions of the employer and the subsequent emotional reaction of the employee. Here, Haubry submitted no medical evidence in the record to support her claim. The trial court did not err in dismissing Haubry's claim for negligent infliction of emotional distress.

5. Negligent hiring, supervision, and retention

The torts of negligent hiring, supervision, and retention have generally been described as follows:

[A]n employer may be liable to a third person for the employer's negligence in hiring or retaining a servant who is incompetent or unfit. Such negligence usually consists of hiring or retaining the employee with knowledge of his unfitness, or of failing to use reasonable care to discover it before hiring or retaining him. The theory of these decisions is that such negligence on the part of the employer is a wrong to such third person, entirely independent of the liability of the employer under the doctrine of respondeat superior. It is, of course, necessary to establish such negligence as the proximate cause of the damage to the third person, and this requires that the third person must have been injured by some negligent or other wrongful act of the employee so hired.[23]

The problem with Haubry's claim under this theory is that Dr. Snow is the sole shareholder, officer, and individual with any real authority in the personal service corporation. This is not a case where there is a school district, a

---

[21] *Hegel*, 136 Wn.2d at 135.

[22] *Hegel*, 136 Wn.2d at 135.

[23] *Scott v. Blanchet High Sch.*, 50 Wn. App. 37, 43, 747 P.2d 1124 (1987) (quoting 53 Am. Jur. 2d *Master and Servant* § 422 (1970) (footnotes omitted)); *see also Lester v. Town of Winthrop*, 87 Wn. App. 17, 26, 939 P.2d 1237 (1997).

corporation with a board of directors, or other hierarchy, responsible for the hiring and retention of the employees. To support Haubry's theory, Dr. Snow (in his corporate capacity in Lawrence W. Snow, M.D., P.S.) would be liable in a situation where he was legally responsible for hiring and retaining himself. This is a direct claim, not one for negligent hiring, supervision, or retention. The trial court was correct in dismissing this claim.

6. Intentional infliction of emotional distress (tort of outrage)

The basis for the trial court's dismissal of this claim was Haubry's failure to provide sufficient medical evidence of the basis for her claim under *Hegel v. McMahon*, discussed above in the negligent infliction of emotional distress issue.

The elements of the tort of intentional infliction of emotional distress are:

> "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress." *Rice v. Janovich*, 109 Wn.2d 48, 61, 742 P.2d 1230 (1987); Restatement (Second) of Torts § 46 (1965). The conduct in question must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' *Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291 (1975). The question of whether certain conduct is sufficiently outrageous is ordinarily for the jury, but it is initially for the court to determine if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability. *Phillips v. Hardwick*, 29 Wn. App. 382, 387, 628 P.2d 506 (1981).[24]

There is no doubt that Dr. Snow's actions were outrageous and inappropriate. However, as with the claim of negligent infliction of emotional distress, to survive summary judgment Haubry necessarily had to establish that the emo-

---

[24] *Birklid v. Boeing Co.*, 127 Wn.2d 853, 867, 904 P.2d 278 (1995) (quoting *Dicomes v. State*, 113 Wn.2d 612, 630, 782 P.2d 1002 (1989) (emphasis omitted)).

tional distress is manifested by objective symptoms.[25] To satisfy the objective symptomatology requirement established in *Hunsley*, Haubry's emotional distress must be susceptible to medical diagnosis and proved through medical evidence.[26] Like the negligence claim, Haubry's claim for the tort of outrage is subsumed in her argument for sexual harassment and she has failed to provide any medical evidence in support of her claim. The trial court did not err in dismissing this claim on reconsideration.

The decision of the trial court is reversed in part, affirmed in part, and remanded for trial on the remaining issues.

AGID, C.J., and COX, J., concur.

---

[25] *Hunsley*, 87 Wn.2d at 436; *see also Hegel*, 136 Wn.2d at 132.

