IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| FAWN BECKER,<br><br>　　　　　　Respondent,<br><br>　　v.<br><br>VALLEY MEDICAL CENTER,<br>PUBLIC HOSPITAL DISTRICT NO. 1,<br>JOSE GOMEZ, and<br>DOES 1 THROUGH 10,<br>inclusive,<br><br>　　　　　　Appellant. | No. 80526-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Jose Gomez was the only male Medical Assistant (MA) at Valley Medical Center's (VMC) New Castle Clinic. He was a known jokester who frequently poked his colleagues and pulled their hair. Colleague Fawn Becker complained to management about Gomez's harassing conduct. After an investigation, VMC told Becker her complaints were unsubstantiated. Becker found another job and resigned. She filed claims for sexual discrimination/harassment hostile work environment, constructive discharge, and wrongful discharge in violation of public policy against VMC.[1] The trial court granted VMC's motion for summary judgment. Becker appeals two of her claims and contends the trial court erred because (1) there are genuine issues of

---

[1] Becker's suit also included claims against Gomez for assault and battery. The trial court entered default judgment against Gomez on those claims. Becker's claims against Gomez are not at issue in this appeal.

Citations and pin cites are based on the Westlaw online version of the cited material.

material fact regarding whether Gomez's harassing conduct is imputable to VMC, and (2) there is a genuine issue of material fact regarding whether VMC constructively discharged Becker from her employment. We reverse and remand.

## FACTS

In January 2017, Gomez started working as the only male MA at the clinic. He made Pac Lab Technician Kelly Thompson, who temporarily worked at the clinic as a third-party vendor, uncomfortable.[2] Thompson believed Gomez was "overly friendly." Thompson felt Gomez's behavior "crossed a line" when he touched the back of her neck, played with her hair, told dirty jokes, and commented on her butt. Thompson felt Gomez's comments about her butt were sexual and inappropriate. Thompson also witnessed Gomez touching other employees' necks. Despite swatting his hands away, Gomez persisted. Pushing a supply cart into her butt was the last straw. Thompson testified, "it just made me really uncomfortable, so I knew I needed to say something."

She confronted Gomez and told him he made her uncomfortable. After Thompson confronted Gomez, he stopped touching her but became rude and passive aggressive. Thompson explained, "it truly felt as if [Gomez] was retaliating against me for telling him to stop the physical contact and it seems as if he is going out of his way to make me feel unwelcome and uncomfortable."

---

[2] Pac Lab was later acquired by LabCorp. As a third-party vendor, Thompson was not a permanent employee at the clinic and her time there did not overlap with Becker's.

In April 2017, Thompson complained to management, who elevated the complaint to then Clinic Manager Rajinder Sandhu, who then elevated the complaint to Senior Human Resources (HR) Partner Leslie Mackey. VMC did not interview Thompson, or anyone besides Gomez, about Thompson's complaint. Sandhu and Mackey interviewed Gomez who denied the allegations. Sandhu coached Gomez on professional communication and told Gomez not to touch anyone when he was trying to get their attention. Sandhu also coached Gomez, "Be aware there is a personal space. You are a male MA. Be aware some people don't want to be touched. Get permission, first." Gomez said, "he would be mindful of his interactions in the future."

On April 3, 2017, Becker started working as an MA at the clinic. Becker was friendly and joked with Gomez, but starting around June 2017, Gomez engaged in behavior that Becker thought was inappropriate.

On October 31, 2017, Becker complained to Clinic Supervisor Alexis Siva about several incidents. She told Siva that Gomez (1) poked her and invaded her private space; (2) told Becker she liked her hair pulled; (3) danced on medical equipment in a sexual manner; (4) thrusted his pelvis at her after commenting on her hair color by saying "once you go black you never to go back" and "oh brown so you always go down"; (5) scratched his "crotch" with a fake skeleton hand that was on Becker's desk and returned it to her desk after she tried to throw it away; (6) played country music on his work computer with

3

the lyrics "hoochie coochie"; and (7) took Becker's boots and placed them out of reach on top of lockers in the break room.

Siva immediately emailed the list of complaints to Clinic Medical Director Dr. Daniel Letinsky and Clinic Coordinator Tracie Trani. Siva wrote that Gomez had previously been talked to about invading people's private space and that there was a previous complaint about Gomez "hugging from behind and unwanted violation of space that was communicated to him repeatedly." That previous complaint was Thompson's.

Siva elevated Becker's complaint to Aaron Sand of VMC's human resources who then initiated an investigation. Siva also informed Sand about Thompson's complaint.

Sand called Becker on November 2, 2017. The two arranged to meet. The parties dispute whether Becker told Sand about an incident where Gomez ran his finger up MA Maggie Gonzalez's leg and whether Becker told Sand that she felt safe at work.

The next day, Becker was absent from work, and Sand interviewed Gomez who "flat-out" denied all the allegations. Sand requested from Becker the names of potential witnesses he could interview. Becker provided three names: MA Reesa Reonal, Gonzalez, and Letinsky. Sand interviewed Reonal and Gonzalez.

Reonal told Sand that Gomez was a "happy-go-lucky guy" who "liked to make people laugh." Reonal did not observe any of the allegations except Gomez putting Becker's boots on the locker as a joke.

Sand interviewed Gonzalez for 15 minutes. Sand asked Gonzalez whether she witnessed anything that a person could interpret as harassing, intimidating, or inappropriate behavior in the workplace. Gonzalez described Gomez as having a generally happy attitude and always trying to have fun and lighten the mood. Gonzalez could not recall an incident that she interpreted as harassing. Gonzalez said Becker was trying to create trouble in the clinic and that Becker exaggerates.

Sand had difficulty scheduling an interview with Letinsky. After interviewing Reonal and Gonzalez, Sand decided he did not need to interview Letinsky because he concluded he could only substantiate Becker's allegation that Gomez put her boots on the locker. Sand did not try to interview other witnesses.

Had Sand interviewed Letinsky, he would have discovered that Letinsky could confirm he yelled at Gomez to "knock it off" during the boots incident, that Gomez frequently pulled MAs' ponytails, and that Gomez danced with a mobile medical equipment called a "robo nurse." Letinsky did not think the dancing was sexual. According to Letinsky, there was joking and teasing in the workplace, "but people seemed to be on board with it." Letinsky "did not witness anybody

responding negatively to it," and he did not observe Gomez making sexually suggestive remarks in the workplace.

Had Sand interviewed MA Bridget DeCordial, Sand would have discovered that Becker told DeCordial that Gomez said, "once you go brown or something down." DeCordial did not report the incident because the comment was not directed at her, and she did not like to get involved in other people's business. DeCordial also testified that Gomez repeatedly pulled employees' ponytails or hair and joked by physically tapping people on the shoulder.

Sand explained in his deposition that his plan was to interview the witnesses Becker listed first, and through those witnesses, he would interview others if they knew there were others to interview. He did not interview others because there were none.

On November 17, 2017, before the investigation concluded, Becker complained to Siva and Letinsky that Gomez showed nude images of a woman on his phone to a coworker, Satwinder Sonu Singh,[3] and said, "Look at the ass on her." Siva and Letinsky did not escalate the complaint to Sand. Siva investigated it herself and both Gomez and Singh denied the allegation.

While investigating Becker's complaint, Sand reviewed the records from Thompson's complaint. Even though the conduct Thompson complained of was similar to the conduct Becker complained of, and even though the conduct took

---

[3] We use the spelling of "Singh" as provided in his deposition. Though the record reflects, VMC employees often misspelled his name.

6

place in the same clinic, Sand did not consider whether Thompson's complaint substantiated Becker's complaint or vice versa. Instead, Sand testified, "I treated this as an individual situation to be investigated and not to reopen something that was closed and addressed through a documented coaching." But, Sand testified it was possible he was concerned and considered that Thompson and Becker's complaints indicated Gomez was engaged in a pattern of conduct. Sand also testified that if HR had confirmed Thompson's complaints about Gomez's unwanted conduct, Gomez's conduct would have "[p]ossibly" warranted his termination.

Sand closed the investigation into Becker's complaint on November 20, 2017, "because the allegations just couldn't be substantiated. There [were] no witnesses."

Around November 27, 2017, Sand and Siva met with Gomez to tell him that Sand could not substantiate the allegations. Sand provided some coaching:

> [D]uring the course of investigation, . . . I had heard a lot of feedback that . . . you like to have fun and joke around in the workplace and . . . maybe you need to scale that back a little bit because obviously something that you're doing is disruptive or upsetting to a person and that you need to be mindful of the kinds of jokes that you may be making or how you present yourself . . . . Be focused on business instead of joking around. And that when you engage in joking behavior in the workplace, it could be interpreted as offensive to some.

Sand instructed Gomez not to discuss the specific allegations or the investigation with anyone.

7

Two days later, on November 29, Siva emailed Letinsky and Trani, "[Gomez] has drifted EXTREMELY back to his old ways with excessive 'touching' and offensive comments to some." Siva testified in her deposition that Gomez went "back to massaging shoulders." Siva testified, "This happened overnight. [Gomez] went all the way back, like reverted all the way back to himself instead of being reserved like he had been after his HR conversation and concluding of the case." Trani responded to Siva's email by writing,

> In addition to the comments regarding [Gomez], I think he needs to be talked to about the music he plays on his computer. . . . [H]e needs to be mindful of the volume and content of the music he is playing. Apparently, another staff in the back office complained today about this (and I recall that this was also something [Becker] had mentioned before too . . .).

During the investigation of Becker's complaint, Becker took a leave of absence. While she was gone, in December 2017, Shana Mason started working as an MA at the clinic. From the time she started, Mason regularly observed Gomez joking with female employees and pulling their hair. She heard Gomez make "weird inappropriate jokes," including "dirty jokes" and "dumb-blonde jokes." Mason recalled Gomez making jokes about peoples' anatomy but not about peoples' private parts. She also saw Gomez come up behind coworkers to give them massages or place his hands on their shoulders. Mason also observed that when a coworker was in Gomez's walking path, Gomez would put his hands on the coworker's waist or shoulder to move them out of his way.

Mason testified she did not complain to anyone at the clinic about Gomez's jokes because Gomez often made inappropriate jokes within earshot of

8

Letinsky and "[i]f [Letinsky] heard it, and was okay with it, there's no point in me saying something" because Letinsky "was part of leadership."

On January 2, 2018, Director of Primary and Urgent Care Clinics Cathy Roberts informed Gomez that Becker was returning to work that day and reminded Gomez to "maintain his professionalism." After the meeting, Gomez emailed Roberts that he felt awkward, he did not want the situation "to get worse for anyone here or management," and he was willing to transfer to a different clinic. Roberts then emailed Sand, "I think [Gomez] understands the magnitude of the situation clearly now!" .

The morning Becker returned from leave, Sand, Roberts, and a union representative met with Becker to inform her Sand had concluded the investigation. Sand told Becker he could not substantiate her allegations except for the boots incident. Sand told Becker, "[W]e do very much take these allegations seriously and we're here to support you."

After Becker returned from leave, Gomez no longer pulled her hair. But, Becker continued to hear Gomez making jokes she thought were inappropriate and observed Gomez thrusting his pelvis. Mason testified in her deposition to knowing Becker thought Gomez's jokes were inappropriate because Becker responded to Gomez's jokes by saying, "That's not true, or I don't think that, [and] that's not okay to say." Mason also testified to Becker telling Mason, "[I]f anyone makes you uncomfortable, I'm available to talk." After she returned from

9

leave, Becker made only one more complaint about Gomez—that Gomez showed his tattoos in violation of clinic policy.

In his deposition, Letinsky said he did not observe Gomez telling inappropriate jokes after Becker returned from leave. However, Mason said Gomez continued to make inappropriate jokes "until he left" his employment at the clinic, which was about one month after Becker left.

On January 6, 2018, Becker informed Roberts that she had applied for a transfer to other VMC clinics. According to Sand, VMC was trying to help Becker transfer to another clinic to "help her to be happy" at VMC, but Becker was engaging in "disruptive behaviors" and would storm out of meetings and that her behavior made it difficult to facilitate a transfer.

On January 22, 2018, management discussed Becker's disruptive behavior with her. That same day, Becker submitted her resignation. In her initial resignation email, Becker wrote, "I have been offered a position that will be supportive and provides safety for me and my needs that Valley cannot provide me."

The next day, Becker wrote another email explaining, "I am specifically referring to Valley Medical Center's handling of my complaints of sexual harassment and sexually inappropriate behavior by Medical Assistant Jose Gomez." Becker wrote that she did not think VMC made reasonable efforts to investigate her complaints. She also wrote,

10

When I returned from my leave I experienced incidents where . . . Gomez would just stare at me with a very uncomfortable blank stare. Also, there were other times where when I was working with a provider and [Gomez] would interrupt my discussion with the provider and talk over me. This behavior was very intimidating and I felt he was doing this as a result of being aware of my complaint of sexual harassment that I had made against him. Finally, in regards to my "safety," even after I made the complaint, . . . Gomez was still doing things in the clinic that were sexually inappropriate or questionable.

Among the complaints Becker wrote about were HR's failure to investigate her complaint to Siva and Letinsky that Gomez showed nude images of women on his phone to Singh during work. She wrote, "I feel that the accusations of my engaging in 'disruptive conduct' have something to do with me making the complaint." Finally, she wrote, "I want you [to] understand that I resigned because I could no longer tolerate the working environment in which Valley was requiring me to work in with . . . Gomez and the way in which my complaints was handle[d]."

On February 1, 2018, Sand emailed Siva to ask if Becker reported her allegation that Gomez showed Singh nude images on his phone to Siva and Letinsky. Siva responded that they investigated the allegation and Becker admitted she did not actually see a photo, but Becker said that she knew what Gomez and Singh viewed was inappropriate. It was in this context that Becker heard Gomez say "look at that ass." Siva said they asked Gomez and Singh about it and they both denied the incident.

Becker initiated a suit against VMC for sexual discrimination/harassment and hostile work environment and under the Washington Law Against

11

Discrimination (WLAD), Chapter 49.60 RCW, constructive discharge and discriminatory termination, and wrongful discharge in violation of public policy. The trial court granted summary judgment to VMC, and dismissed Becker's claims with prejudice.

Becker appeals her hostile work environment and constructive discharge claims.

DISCUSSION

*A. Motion to Strike a Section of Becker's Reply Brief*

VMC requests this court strike section IV(B)(ii) of Becker's reply brief because it presents a new argument that VMC is liable for Gomez's non-sexual hostile gender-based conduct. Becker argues section IV(B)(ii) does not raise a new issue on appeal because it further analyzes the "existing issue of whether Gomez's sexual harassment continued following the corrective action and what type of conduct qualifies as sexual harassment in a hostile work environment claim."

RAP 10.3(c) provides, "A reply brief should conform with [RPC 10.3(a)] subsections (1), (2), (6), (7), and (8) . . . and be limited to a response to the issues in the brief to which the reply brief is directed." RAP 10.3(a)(6) requires the brief of appellants and respondents to include an "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record."

Here, Becker does not assert a new issue or new facts. Instead, Becker is replying to the issue and arguments in VMC's response brief. VMC concedes the only issue on appeal is whether Gomez's behavior is imputable to VMC. Yet, in its response, VMC repeatedly argues that much of Gomez's touching was not sexual or offensive to anyone except Becker. Becker appropriately replied that VMC could be liable for Gomez's non-sexual hostile gender-based conduct. Becker provides citations to legal authority in compliance with RAP 10.3(a)(6) and (c). Therefore, we deny VMC's motion to strike.

VMC also argues, under RAP 2.5(a), Becker impermissibly raises a new argument for the first time on appeal. RAP 2.5(a) provides, "The appellate court may refuse to review any claim of error which was not raised in the trial court." Below, Becker did not use the exact phrase, "non-sexual hostile gender-based conduct," as she does here. But the evidence presented has not changed. Whether some conduct was sexual or not sexual does not change the prima facie elements that Becker must prove at trial. Besides, the issue on appeal is whether there is a genuine issue of material fact as to whether VMC took reasonably prompt and adequate corrective action to stop Gomez's harassing behavior and whether VMC constructively discharged Becker. VMC's argument is unpersuasive. Accordingly, we deny VMC's motion to strike.

## B. Standard of Review

This court reviews a trial court's grant of summary judgment de novo. Cornwell v. Microsoft Corp., 192 Wn.2d 403, 410, 430 P.3d 229 (2018). Summary judgment is appropriate only where "there is no genuine issue as to

13

any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). "A genuine issue of material fact exists if reasonable minds could disagree on the conclusion of a factual issue." LaRose v. King County, 8 Wn. App. 2d 90, 103, 437 P.3d 701 (2019). This court considers the facts and reasonable inferences in the light most favorable to the nonmoving party. Mikkelsen v. Pub. Utility Dist. No. 1 of Kittitas County, 189 Wn.2d 516, 526, 404 P.3d 464 (2017).

"Summary judgment should rarely be granted in employment discrimination cases." Sangster v. Albertson's, Inc., 99 Wn. App. 156, 160, 991 P.2d 674 (2000). That said, "[i]n order for a plaintiff alleging discrimination in the workplace to overcome a motion for summary judgment, he or she must do more than express an opinion or make conclusory statements. The plaintiff must establish specific and material facts to support each element of his or her prima facie case." Haubry v. Snow, 106 Wn. App. 666, 670, 31 P.3d 1186 (2001).

*C. Hostile Work Environment*

Becker argues there is a genuine issue of material fact regarding whether Gomez's harassing conduct is imputable to VMC because there is a genuine issue of material fact as to whether, after VMC knew of Gomez's harassing conduct, VMC took reasonably prompt and adequate corrective action. We agree.

The WLAD prohibits employment discrimination based on sex. RCW 49.60.180(3) provides it is an unfair practice for any employer "[t]o

14

discriminate against any person in compensation or in other terms or conditions of employment because of . . . sex."

To establish a prima facie claim of a sexual harassment hostile work environment, the plaintiff must show the harassment was "(1) unwelcome conduct, (2) based on sex, (3) affecting the terms and conditions of employment, and (4) imputed to the employer." Perry v. Costco Wholesale, Inc., 123 Wn. App. 783, 791, 98 P.3d 1264 (2004). For purposes of this appeal, VMC concedes the first three elements. Accordingly, only the fourth element is at issue here.

There are two ways workplace harassment is imputable to an employer. First, "[w]here an owner, manager, partner or corporate officer personally participates in the harassment." Glasgow v. Georgia-Pacific Corp., 103 Wn.2d 401, 407, 693 P.2d 708 (1985). Second, where the harassment is by the plaintiff's supervisor or coworker and the plaintiff shows "the employer (a) authorized, knew, or should have known of the harassment and (b) failed to take reasonably prompt and adequate corrective action." Id.

Here, Becker argues Gomez's harassing conduct is imputable to VMC because Gomez was her coworker, VMC knew about the harassment, and VMC failed to take reasonably prompt and adequate corrective action. To impute liability for a discriminatory work environment created by a coworker, Becker must show: (a) she complained "to the employer through higher managerial or supervisory personnel or by proving such a pervasiveness of sexual harassment at the workplace as to create an inference of the employer's knowledge or constructive knowledge of it," and (b) "the employer's remedial action was not of

15

such nature as to have been reasonably calculated to end the harassment."
Perry, 123 Wn. App. at 791-92 (quoting Glasgow, 103 Wn.2d at 407).

"Once an employer has actual knowledge through higher managerial or supervisory personnel of a complaint of sexual harassment, then the employer must take remedial action that is reasonably calculated to end the harassment." Id. at 793. "[T]he reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment. In evaluating the adequacy of the remedy, the court may also take into account the remedy's ability to persuade potential harassers to refrain from unlawful conduct." Id. at 793-95 (quoting Ellison v. Brady, 924 F.2d 872, 882 (1991)). "Repeat conduct may show the unreasonableness of prior responses." Id. at 794.

Here, it is undisputed that VMC received complaints about Gomez's behavior from Thompson in April 2017 and from Becker in October and November 2017. Becker established that VMC "authorized, knew, or should have known of the harassment." See Glasgow, 103 Wn.2d at 407.

Becker raises a genuine issue of material fact as to whether VMC took "remedial action reasonably calculated to end the harassment." Perry, 123 Wn. App. at 793. VMC leadership responded to both Thompson and Becker's complaints by conducting investigations and coaching Gomez "to remain professional at work."

Siva's November 29, 2017 email to Letinsky, sent two days after Gomez received more coaching, suggested that repeating the same type of remedy that

16

was given after Thompson's complaint was ineffective in that Gomez "has drifted EXTREMELY back to his old ways with excessive 'touching' and offensive comments to some." Despite this email that suggests otherwise, VMC argues that most of the female MAs do not mind Gomez poking them or pulling their hair and that Gomez stopped such behavior with Becker. However, according to Becker, after she returned from her leave, Gomez continued to make inappropriate jokes and thrust his pelvis. Another MA, Mason, confirmed that Gomez, in Becker's presence, made jokes that Becker felt were inappropriate. And these jokes occurred after VMC coached Gomez for the second time and reminded him to be professional when Becker returned from leave.

The depositions of at least three different people suggests that some incidents Becker complained of, but VMC found unsubstantiated, occurred. Letinksy confirmed Gomez danced with the robo nurse. DeCordial recalled Gomez saying something to the effect of "once you go brown or something down." Though Letinksly believed that "people seemed to be on board" with Gomez's jokes and teasing, Mason said she did not complain about inappropriate jokes because they were made in front of Letinsky, who was part of the leadership team, and "[i]f he heard it, and was okay with it, there's no point in me saying something."

Becker established a genuine issue of material fact. A reasonable factfinder could conclude that VMC failed to take remedial measures reasonably calculated to end the harassment. For these reasons, the trial court erred by summarily dismissing Becker's hostile work environment claim.

17

*D. Constructive Discharge*

Becker argues the trial court erred in granting summary judgment dismissing her claim for constructive discharge. We agree.

RCW 49.60.180(2) provides that it is an unfair practice for any employer "[t]o discharge . . . any person from employment because of . . . sex."

To prove constructive discharge, the employee must show: (a) "a deliberate act by the employer that made [the] working conditions so intolerable that a reasonable person would have felt compelled to resign;" and (b) the employee "resigned because of the conditions and not for some other reason." Washington v. Boeing Co., 105 Wn. App. 1, 15, 19 P.3d 1041 (2000) (citing Sneed v. Barna, 80 Wn. App. 843, 849, 912 P.2d 1035 (1996)). "The inquiry is whether 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " Sneed, 80 Wn. App. at 849 (quoting Stork v. Int'l Bazaar Inc., 54 Wn. App. 274, 287, 774 P.2d 22 (1989)).

Whether working conditions are intolerable is a question of fact. Id. The employee can show intolerable conditions by a "continuous pattern of discriminatory treatment" or other "aggravating circumstances." Id. at 850. "An employee's frustration . . . is not enough to show intolerable working conditions." Crownover v. State ex rel. Dep't of Transp., 165 Wn. App. 131, 149, 265 P.3d 971 (2011).

"Additionally, the employee must show that she resigned because of the conditions and not for some other reason, like finding a better job." Wahl v. Dash

18

Point Family Dental Clinic, Inc., 144 Wn. App. 34, 44, 181 P.3d 864 (2008). "A resignation is presumed to be voluntary, and it is incumbent upon the employee to introduce evidence to rebut that presumption." Sneed, 80 Wn. App. at 849.

In Haubry v. Snow, we determined Haubry established "a question of material fact as to whether the workplace situation into which Haubry was placed would compel a reasonable person to resign" and reversed the trial court's grant of summary judgment to her employer. 106 Wn. App. at 678. Haubry's employer made her feel uncomfortable by repeatedly "approach[ing] Haubry from behind and plac[ing] his hands on top of her shoulders," touching and squeezing Haubry, staring at Haubry, commenting on Haubry's outfits, and making sexual comments. Id. at 671-73. Haubry asserted she left her employment "because she was so uncomfortable working in the office when [the employer] was present." Id. at 673. Other employees provided affidavits about their similar experiences and about observing the employer's behavior toward Haubry. Id. We determined, "While it may be a difficult burden for Haubry to prove that the conditions were 'intolerable' at trial, the evidence is sufficient to avoid a summary judgment dismissal of the constructive discharge claim." Id. at 678.

Like in Haubry, Becker asserted evidence sufficient to avoid summary judgment dismissal of the constructive discharge claim. Becker provided evidence that Gomez repeatedly approached Becker and other MAs from behind to touch their shoulders and pull their hair. Becker provided evidence that, even after complaining, VMC continued to allow a work environment where Gomez

told inappropriate jokes, touched female coworkers, and made Becker feel uncomfortable.

Based on the evidence provided, we believe Becker established a genuine issue of material fact as to whether she overcame the presumption that she resigned voluntarily and as to whether VMC's failure to correct Gomez's harassing conduct made working conditions so intolerable that a reasonable person in Becker's shoes would feel required to resign.

CONCLUSION

Considering the facts and reasonable inferences in the light most favorable to Becker, Becker raises genuine issues of material fact as to whether Gomez's harassing conduct is imputable to VMC and VMC is liable for the hostile work environment. Becker also raises a genuine issue of material fact as to whether VMC constructively discharged Becker because VMC's failure to adequately correct Gomez's harassing conduct made working conditions so intolerable that a reasonable person in Becker's shoes would feel required to resign. We reverse and remand.

_____
Coburn, J.

WE CONCUR:

_____     _____
Chun, J.                                                        Smith, J.