

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SIYA SIM, | ) | No. 39013-6-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF WASHINGTON | ) | |
| DEPARTMENT OF LABOR & | ) | |
| INDUSTRIES, a Washington State | ) | |
| agency, | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondent, | ) | |
| | ) | |
| "DOE(S) 1-100," employees of the | ) | |
| STATE OF WASHINGTON | ) | |
| DEPARTMENT OF LABOR & | ) | |
| INDUSTRIES; and "CORPORATION(S) | ) | |
| XYZ 1-100," | ) | |
| | ) | |
| Defendants. | ) | |

PENNELL, J. — Siya Sim appeals the summary judgment dismissal of her complaint against the Department of Labor and Industries (L&I) for workplace discrimination and related torts. We affirm.

FACTS

Siya Sim, a United States citizen of Cambodian heritage, began working for L&I in the 1990s. In 2014, Michelle Schiller became Ms. Sim's supervisor. At that point,

Ms. Sim was in her late forties and held a position as an Office Assistant 3 (OA3) in L&I's pension support unit. Ms. Sim's position entailed answering incoming calls and assisting callers, entering data into pensioners' records, and checking the work of her coworkers to ensure completeness and accuracy.

Ms. Sim and Ms. Schiller had a strained relationship. Ms. Sim believed Ms. Schiller managed her "under a higher level of scrutiny than" her coworkers. Clerk's Papers (CP) at 320. Ms. Sim believed Ms. Schiller played favorites, and that Ms. Sim was not one of those favorites. For example, Ms. Sim claimed Ms. Schiller scolded her if she was even one minute late to work, but that her coworkers were not treated in the same way. Ms. Sim also claimed her coworkers often took breaks with Ms. Schiller at peak call times, leaving Ms. Sim to answer the phone alone.

In a sworn declaration in support of summary judgment, Ms. Schiller wrote that when she took over the pension support unit, she "found that [Ms. Sim] was not punctual, took lunches that were longer than allowed, and often went home early, especially if a customer call frustrated her." *Id*. at 273. Ms. Schiller also "found Ms. Sim's data entry speed and accuracy rate were below the minimum performance standards for the position" and that Ms. Sim "had trouble completing the required tasks of her job efficiently and without error." *Id*.

In February 2014, Ms. Schiller sent Ms. Sim a memorandum setting out written expectations. In the memorandum, Ms. Schiller wrote she was "concerned about [Ms. Sim's] ability to perform all aspects of this position." *Id*. at 277. Ms. Schiller informed Ms. Sim: "I continue to receive complaints on your customer service skills, ability to pay attention to details, and your ability to learn the required tasks of the day to day activities of the job." *Id*. With respect to customer service, Ms. Schiller informed Ms. Sim she needed to treat L&I callers more respectfully and courteously, and specifically reminded Ms. Sim she should not be raising her voice when speaking with customers.

"Most importantly," Ms. Schiller wrote, Ms. Sim needed to pay attention to details and reduce her rate of error, because "[m]istakes financially impact our customers and actuaries." *Id*. Ms. Schiller wrote, "This doesn't mean you can work slower than everyone else," and reiterated the importance of working quickly without sacrificing accuracy. *Id*. Ms. Schiller met with Ms. Sim to discuss the expectations memorandum. Ms. Sim disliked meeting with Ms. Schiller: she felt Ms. Schiller berated her and spoke down to her as if she were addressing a child.

Ms. Sim and Ms. Schiller each signed a performance planning and appraisal form setting expectations and goals for Ms. Sim to achieve. This individualized plan required

additional training and counseling for Ms. Sim, including one-on-one meetings with Ms. Schiller. Despite this continued assistance, Ms. Schiller reported she continued to receive complaints about Ms. Sim's customer service skills and purportedly inadequate work performance.

In December 2014, Ms. Schiller sent Ms. Sim a counseling memo, which identified itself as nondisciplinary in the first paragraph. The memorandum informed Ms. Sim that the problems Ms. Schiller identified in her February memorandum persisted. Specifically, the memorandum was apparently prompted by a formal complaint about Ms. Sim made to L&I Director Joel Sacks. An attorney who spoke to Ms. Sim on the phone informed Director Sacks that Ms. Sim was "never ready to take a phone call," that she repeatedly asked for claim numbers, and that Ms. Sim was unable to provide meaningful assistance. *Id*. at 289.

Ms. Schiller expressed that problems with Ms. Sim's customer service had been ongoing, writing: "You have been in the [pension support] unit for over 6 years and you still have difficulty assisting our customers and you ask several questions to your co-workers and other members of the team. Often the things you ask are things you should be able to answer on your own." *Id*. The memorandum reiterated Ms. Schiller's

expectations for Ms. Sim and encouraged her to take steps to improve her behavior and performance at work.

In 2015, one of Ms. Sim's coworkers, Chris Huynh, was promoted to replace Ms. Schiller, who was in turn promoted to oversee the larger program that included Ms. Sim's unit. During the transitional period, Ms. Schiller and Mr. Huynh worked together to formulate a plan to assist Ms. Sim in meeting performance expectations. On March 3, 2015, Ms. Schiller e-mailed Ms. Sim's union representative to explain their "plan to continue to assist [Ms. Sim] in being successful in her position." *Id*. at 293. Under this plan, Mr. Huynh would meet with Ms. Sim biweekly. The plan also assigned another staff member to sit with Ms. Sim for two hours each week to listen in and coach Ms. Sim on how to capably help customers over the phone. Ms. Schiller and Mr. Huynh also continued to seek out appropriate training for Ms. Sim.

Throughout her time at L&I, Ms. Sim felt Mr. Huynh and Ms. Schiller treated her like an outcast and belittled her. According to Ms. Sim, when she said "'hi' or "'good morning'" to Ms. Schiller and Mr. Huynh, they would glare at her and turn the other way, causing her to cry. *Id*. at 320. Ms. Sim wrote, "I felt that they mocked me a lot," and said that, consequently, she found learning from them difficult and felt uncomfortable asking

questions. *Id*. Ms. Sim alleged that unnamed coworkers would come to her desk to empathize with her purported mistreatment.

In April 2015, Chris Huynh sent Ms. Sim a letter of reprimand for failing to meet performance expectations. In the letter, Mr. Huynh wrote that, despite additional training and coaching, Ms. Sim still "struggle[d] to meet" expectations. *Id*. at 255. Mr. Huynh reported that, since the last counseling memo, multiple customers and L&I staff had complained about Ms. Sim, and he listed several examples. For instance, according to Mr. Huynh:

- A customer told Mr. Huynh that Ms. Sim told her to "'shut her mouth,'" an accusation Ms. Sim denied. *Id*. at 256, 321.

- A man called with a simple question about direct deposit and Ms. Sim put him on a lengthy hold before transferring him to a peer to answer the question.

- Ms. Sim transferred phone calls to pension adjudicators without first telling them they would need an interpreter to speak to the caller.

- An "extremely upset" attorney called Mr. Huynh to tell him their client would not receive a pension payment that month, an error Mr. Huynh explained was due to Ms. Sim's delayed processing of the pensioner's documentation. *Id*. at 256. Two other claimants had called with similar complaints.

Mr. Huynh wrote to Ms. Sim: "You have been in the unit for several years and should not be encountering difficulties in assisting our customers with basic information." *Id*. at 256-57.

The letter also reprimanded Ms. Sim for having "a higher error rate than others doing the same type of work." *Id*. at 257. Mr. Huynh wrote he was "concerned about [Ms. Sim's] ability to understand the impact [her] errors have on the unit and how it affects [L&I's] customers." *Id*. He observed Ms. Sim had an opportunity to respond to the concerns raised by the letters at four recent meetings, and that she either denied the allegations or falsely claimed she had not been trained. The letter informed Ms. Sim her continual failure to meet L&I's expectations opened her up to further disciplinary action, including termination.

In response to Mr. Huynh's reprimand letter, Ms. Sim's filed a grievance through her union, asserting the letter violated her rights under the relevant collective bargaining agreement. The grievance asserted L&I and Ms. Sim's coworkers had discriminated against Ms. Sim on the basis of race.

Attempts to informally resolve Ms. Sim's grievance collapsed. Subsequently, the disciplinary process against Ms. Sim was paused, and an L&I investigator was assigned to look into Ms. Sim's allegations of discrimination and harassment.

In addition to reviewing Ms. Sim's personnel file, the investigator interviewed Ms. Sim—accompanied by her union representative—and 13 other L&I employees who had supervised or worked with Ms. Sim.

Approximately five months later, in September 2015, the investigator issued a 15-page report summarizing their findings. The report concluded as follows:

> The evidence presented shows that although [Ms. Sim] has been in her position for five years, she has a higher incidence of errors and continues to make repeated mistakes on routine tasks. Her current Supervisor, former Supervisor, and coworkers are consistent in their observation of [Ms. Sim's] continual need for assistance.
>
> There was no evidence produced or discovered that national origin, accent, or appearance was a factor in the discipline taken, or that [Ms. Sim] was subjected to a hostile work environment.

*Id*. at 86.

Following receipt of the investigation report, L&I denied Ms. Sim's grievance and upheld Mr. Huynh's reprimand letter. Ms. Sim subsequently received a three-month pay reduction as discipline. In addition to reciting Ms. Sim's background of documented errors and complaints, the disciplinary letter stated additional bases for the pay cut. In June 2015, Mr. Huynh received two additional complaints, from (1) a pensioner whose documents were mailed to an incorrect address due to Ms. Sim's failure to accurately verify a new address given by the pensioner in a phone call to Ms. Sim, and (2) a

8

pensioner Ms. Sim had confused by erroneously telling the pensioner they had incorrectly filled out a required form. In response to this pay reduction, Ms. Sim filed another grievance through her union that she subsequently withdrew.

Months later, in June 2016, Mr. Huynh issued another letter recommending Ms. Sim be disciplined. The justification was Ms. Sim's continued failure to improve her performance since her previous disciplinary action. In lieu of being disciplined, Ms. Sim took a voluntary demotion, and began a six-month trial service period as an Office Assistant 2 (OA2) in L&I's insurance services unit.

Article 4.5.B.1 of L&I's collective bargaining agreement mandated six-month trial service periods for employees taking voluntary demotions. Ms. Sim received a welcome letter from insurance services informing her that her trial service period would begin February 16, 2017, and would last six months. Despite this, at least one other document erroneously listed Ms. Sim's trial service period as ending in October instead of August.

Sarah Gonzales supervised Ms. Sim in her new position. The insurance services unit was overseen by Jimmy Huynh, apparently Chris Huynh's brother. Ms. Sim's OA2 position involved data entry of medical bills, with no public-facing interactions. Ms. Sim and Ms. Gonzales signed a performance plan setting out the expectations for Ms. Sim's

trial service period. Ms. Sim's trial service period included two phases, with each phase

focusing on processing different types of bills.

During her trial service period, Ms. Sim was expected to meet numerical

thresholds for both the number of bills she processed (bills-per-hour requirement), and the

accuracy with which she processed them (quality assurance or QA threshold). Ms. Sim

was expected to maintain 98.5 percent accuracy throughout the entire trial service period.

However, on at least one page of her performance plan, the expected QA threshold was

instead listed as 98 percent. The bills-per-hour requirement gradually increased: for

example, at the end of the third week after the actual processing of bills had commenced

Ms. Sim was expected to be keying 26 documents per hour. By the end of week five, she

was expected to key 39 documents per hour. By the end of week seven, Ms. Sim was

expected to be keying 53 bills per hour.

Ms. Gonzales took extensive, daily notes on Ms. Sim's performance during the

trial service period. Ms. Gonzales met frequently with Ms. Sim and urged her to ask

questions when she needed help. A coworker was assigned to sit with Ms. Sim for the

first several days and help her, but the coworker informed Ms. Gonzales that Ms. Sim

did not listen and often spoke over her. Throughout the trial service period, Ms. Gonzales

repeatedly urged Ms. Sim to utilize "Ask L&I," an interactive electronic resource for

employees to consult. *Id*. at 94-96, 101-03, 105-15, 119, 125, 131, 142-46, 203, 205-06, 208. Ms. Sim chafed at using the resource as intended. Instead, Ms. Sim insisted on printing out pages from Ask L&I and highlighting irrelevant portions, even after Ms. Gonzales attempted to correct this behavior.

Ms. Gonzales's notes reflect Ms. Sim performed "below expectations" throughout the trial service period. *Id*. at 105, 107, 119, 121-24, 130, 133. On April 11, 2017, Ms. Sim asked Ms. Gonzales how she was doing at work, and Ms. Gonzales told her: "not well." *Id*. at 113. Though Ms. Sim did meet her 98.5 percent threshold on certain isolated days, she never consistently met that expectation for an entire month, and she did not average above 98.5 percent accuracy for an entire week until June, more than four months into her service period. According to progress e-mails sent by a coworker, Ms. Sim never maintained her bills-per-hour expectation for an entire week. Ms. Gonzales frequently informed Ms. Sim about her failure to meet expectations. In mid-July, Ms. Gonzales reminded Ms. Sim she was supposed to advance to the second phase of the trial service period months before in mid-April, but had been unable to advance due to her poor performance.

In July 2017, Ms. Gonzales informed her superiors of Ms. Sim's failure to meet expectations and Ms. Sim's failure to pass out of the first phase of the two-phase training

11

period. Ms. Gonzales recommended extending Ms. Sim's trial service period because

"[Ms. Sim] has been unable to sustain consistent minimum performance requirements."

*Id*. at 138. Ms. Gonzales opined that a three-month extension of Ms. Sim's trial service

period might give her more time to start improving.

On August 4, 2017, with the end of the six-month trial service period less than two

weeks away, Jimmy Huynh met with Ms. Sim and her union representative. Jimmy Huynh

informed Ms. Sim she had not met the accuracy and performance expectations of her trial

service. Under the collective bargaining agreement, Ms. Sim had the option to revert to a

vacant OA3 position, provided she was qualified for the job. Jimmy Huynh discussed this

option with Ms. Sim. He informed her that L&I's human resources department had

identified one available OA3 position in the imaging unit. This position required

applicants to type at least 45 words per minute. The position also required applicants to

pass an imaging assessment consisting of three tasks. Ms. Sim took the typing test and the

imaging assessment, and failed both.

As Ms. Sim had failed the requisite tests for the only vacant position, L&I's chief

administrative officer recommended termination. A handwritten note on a memorandum

to the assistant director for insurance services recommending termination stated "[o]ther

OA2 & OA3 options [were] reviewed" and that search found no other vacant positions

for which Ms. Sim qualified. *Id*. at 448. Ms. Sim's employment with L&I was terminated on August 15, 2017.

Ms. Sim sued L&I, asserting tort claims and violations of Washington's Law Against Discrimination (WLAD), chapter 49.60 RCW. L&I denied Ms. Sim's allegations and moved for summary judgment. The trial court granted L&I's motion and Ms. Sim timely appealed. A Division Three panel considered Ms. Sim's appeal with oral argument after receiving an administrative transfer of the case from Division Two.

ANALYSIS

This court reviews orders of summary judgment de novo. *Turner v. Dep't of Soc. & Health Servs.*, 198 Wn.2d 273, 284, 493 P.3d 117 (2021). Summary judgment is appropriate when—considering evidence and reasonable inferences in a light most favorable to the nonmovant—the material facts are not genuinely disputed and the movant is entitled to judgment as a matter of law. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). Where a nonmovant has presented insufficient evidence on any required element of their case, then all other facts are necessarily rendered immaterial. *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989).

I.      *Discrimination claim under WLAD*

WLAD provides a civil cause of action for various forms of employment discrimination. *See* RCW 49.60.180, .030(2). A plaintiff alleging employment discrimination under WLAD can prove their case through direct evidence of discriminatory animus, but such evidence is rarely available as employers seldom announce a discriminatory motive. *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 179-80, 23 P.3d 440 (2001). Where a plaintiff lacks direct evidence, Washington courts use the burden-shifting *McDonnell Douglas* framework prescribed by the United States Supreme Court. *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 445, 334 P.3d 541 (2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)).

This burden-shifting analysis has three steps. A plaintiff must first establish a prima facie case of discrimination. *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County*, 189 Wn.2d 516, 527, 404 P.3d 464 (2017). If this is met, the burden shifts to the employer to produce a nondiscriminatory justification for its actions. *Id*. Should the employer meet this production burden, the burden shifts back to the plaintiff to show the employer's justification is an invalid pretext. *Id*.

Ms. Sim contends she was subjected to employment discrimination on the basis of race and age. Her WLAD claims implicate four theories of employment discrimination: discriminatory discharge, disparate treatment, retaliation, and hostile work environment. Ms. Sim has not produced direct evidence of discrimination to support any of her discrimination claims. The *McDonnell Douglas* burden-shifting test therefore applies.

### a.    Discriminatory discharge

A plaintiff may make a prima facie case of discriminatory discharge by showing that the plaintiff (1) is a member of a protected class, (2) was discharged by the defendant, and (3) doing satisfactory work. *Crabtree v. Jefferson County Pub. Hosp. Dist. No. 2*, 20 Wn. App. 2d 493, 508, 500 P.3d 203 (2021).

Ms. Sim fails to meet the third of these components. Although Ms. Sim is a member of protected classes and was discharged, there is no evidence of satisfactory work performance. L&I thoroughly documented Ms. Sim's struggles to adequately perform her job duties over the course of multiple years. Ms. Sim's employment records did not merely show she needed improvement. The records showed L&I found her performance unsatisfactory and that she needed to improve in order to meet minimum standards. While Ms. Sim claims her work performance was satisfactory, this conclusory self-characterization is not sufficient to support a prima facie case. *Grimwood v. Univ.*

*of Puget Sound*, 110 Wn.2d 355, 359-60, 753 P.2d 517 (1988), *abrogated on other grounds by Mikkelsen*, 189 Wn.2d 516.

Ms. Sim asserts she was doing well during her trial period, but the record does not bear this out. Contrary to Ms. Sim's position on appeal, Ms. Gonzales did not recommend Ms. Sim's trial service be extended because Ms. Sim had been performing well. Ms. Gonzales recommended an extension because Ms. Sim had been "unable to sustain consistent minimum performance requirements" and needed further time to "meet . . . expectations." CP at 138-39. While Ms. Sim sometimes met at least a 98 percent accuracy[1] threshold during her time with the insurance services unit, she never consistently met the bills-per-hour requirement and does not argue otherwise. Contrary to Ms. Sim's arguments, her performance fell below that of her peers. With vanishingly few exceptions, other L&I employees were achieving accuracy rates upwards of 99 percent each month, with many hitting 99.98 percent or higher.

Similarly, Ms. Sim's claim that human resources used flawed testing procedures after identifying a vacant position in the imaging unit is unfounded. The imaging unit

---

[1] Ms. Sim complains she was variously told there were two accuracy thresholds, 98 percent and 98.5 percent. This is a red herring. Ms. Sim never consistently met either threshold and she never consistently met the bills-per-hour requirement. The purported discrepancy between the two accuracy thresholds is thus immaterial.

position required Ms. Sim to pass a typing test and imaging assessment. Ms. Sim claims

the typing test was subject to score manipulation, but she points to no evidence to support

this claim. The typing test notwithstanding, Ms. Sim does not explain why she should not

have been expected to pass the imaging assessment, which she also failed.

Finally, Ms. Sim fails to show she was not given opportunities for improvement.

Ms. Sim was given a full six-month trial period, during which she failed to meet

expectations even for a short amount of time. Ms. Sim points to a performance planning

and appraisal form that mistakenly listed her trial service period ending in October instead

of August. Ms. Sim fails to explain why this stray misstatement of the end of the trial

service period entitled her to continue working beyond the six-month period. Further,

Ms. Sim fails to explain her failure to improve over the six-month period, beyond her

own subjective assessment that she was not given a fair chance.[2]

Ms. Sim's protestations that her work performance was satisfactory are

unsupported by the record. She has failed to raise a prima facie case of discriminatory

discharge.

---

[2] This would be a different case if there were any named witnesses who could back up Ms. Sim's subjective assessment that she was a victim of shifting expectations and unwarranted scrutiny. *Cf. Haubry v. Snow*, 106 Wn. App. 666, 676, 31 P.3d 1186 (2001).

b.      *Disparate treatment*

WLAD protects employees from disparate treatment on the basis of protected traits. The elements of a prima facie case of disparate treatment are (1) membership in a protected class, and (2) less favorable treatment in conditions of employment (3) than a similarly situated, nonprotected employee, (4) doing substantially the same work. *Washington v. Boeing Co.*, 105 Wn. App. 1, 13, 19 P.3d 1041 (2000).

Beyond the first element, Ms. Sim has not met the terms for a prima facie case. The record does not disclose any evidence of nonprotected employees with performance problems comparable to Ms. Sim's receiving more favorable treatment. Ms. Sim complains Ms. Schiller played favorites. She alleges that Ms. Schiller did not scold Ms. Sim's younger, white colleagues for lateness and that Ms. Schiller would take breaks with other subordinates but not with Ms. Sim. But there is no evidence Ms. Sim's coworkers suffered from productivity problems or generated frequent customer complaints. That is, Ms. Sim has not furnished evidence that she and her peers were "similarly situated." *Id*. at 14. It is not discriminatory for an employer to show a preference for employees who are largely meeting job expectations over an employee who has numerous documented performance deficiencies. Ms. Sim has not made a prima facie case of disparate treatment.

c.      *Retaliation*

A prima facie case of retaliation requires an employee to show: "(1) the employee

took a statutorily protected action, (2) the employee suffered an adverse employment

action, and (3) a causal link between the employee's protected activity and the adverse

employment action." *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 411, 430 P.3d 229

(2018).

Ms. Sim fails to establish a prima facie case because her purportedly protected

activity took place after L&I identified performance deficiencies and initiated the

disciplinary process, not before. Under these circumstances, there is no inference of

a causal link. *See Francom v. Costco Wholesale Corp.*, 98 Wn. App. 845, 862-63, 991

P.2d 1182 (2000) (analyzing how soon *after* WLAD-protected activity employer engaged

in purportedly retaliatory action).

Ms. Sim identifies her union grievance, filed on April 21, 2015, as an activity

protected by WLAD. The grievance was submitted shortly after Chris Huynh's letter

of reprimand. Once Ms. Sim filed her grievance, L&I halted the disciplinary process.

It then assigned an investigator to look into Ms. Sim's claims of discrimination.

The investigation lasted approximately five months. It was only after the investigator

concluded that Ms. Sim's complaints were without merit and that Ms. Sim's work

performance was not satisfactory that L&I upheld its letter of reprimand and reduced Ms. Sim's pay. An inference of discriminatory intent does not apply under these circumstances. *See Milligan v. Thompson*, 110 Wn. App. 628, 638-39, 42 P.3d 418 (2002) (summary judgment appropriate where "nonretaliatory evidence is strong").

### d.     Hostile work environment

A prima facie case of a hostile work environment requires a plaintiff to show they suffered harassment[3] that was (1) unwelcome (2) because of membership in a protected class, (3) sufficiently pervasive, and (4) imputable to the employer. *Loeffelholz v. Univ. of Wash.*, 175 Wn.2d 264, 275, 285 P.3d 854 (2012).

Here, Ms. Sim has failed to point to any objective evidence that she was mistreated on account of race or age. Ms. Sim's subjective speculation that her alleged mistreatment by coworkers and supervisors was because of her race and age is not sufficient. *See Domingo v. Boeing Emps.' Credit Union*, 124 Wn. App. 71, 84-85, 98 P.3d 1222 (2004), *abrogated on other grounds by Mikkelsen*, 189 Wn.2d 516. Ms. Sim alleges that L&I employees glared at her, gossiped about her, and ignored her when she greeted them. If true, such incidents would undoubtedly be hurtful. But because of Ms. Sim's failure

---

[3] Harassment is conduct which is "undesirable or offensive" and "unwelcome in the sense that the plaintiff-employee did not solicit or incite it." *Glasgow v. Georgia-Pac. Corp.*, 103 Wn.2d 401, 406, 693 P.2d 708 (1985).

to point to facts supporting an inference that those alleged incidents were because of her protected traits, this claim fails. Moreover, the vagueness of the allegations prevents this court from meaningfully reviewing whether the complained-of conduct was sufficiently pervasive. *See Davis v. Fred's Appliance, Inc.*, 171 Wn. App. 348, 362, 287 P.3d 51 (2012) (noting that courts must assess the "frequency and severity" of complained-of conduct in deciding whether it was "objectively and subjectively abusive").

Ms. Sim's burden was not a high one. *See Haubry v. Snow*, 106 Wn. App. 666, 676, 31 P.3d 1186 (2001) (reversing dismissal on summary judgment even while admitting plaintiff's case "may be difficult to prove at trial"). A plaintiff might support a claim of a work environment hostile to women by introducing evidence that their employer tolerated other employees affixing photographs of partially clad women to office walls. *Mackay v. Acorn Custom Cabinetry, Inc.*, 127 Wn.2d 302, 305, 898 P.2d 284 (1995). Or a plaintiff might substantiate their accusation by introducing corroborating affidavits of other employees. *Haubry*, 106 Wn. App. at 676 (holding plaintiff's admittedly "subjective" accusations that boss leered at her were "substantiated" by affidavits of other women who worked for boss).

But because Ms. Sim has not identified any specific instance of race- or age-based harassment—let alone a pervasive pattern of such instances that served as a barrier to workplace equality—her hostile work environment claim was properly dismissed.

## II.     *Wrongful termination in violation of public policy*

Ms. Sim contends that by disciplining and terminating her, L&I contravened a clear public policy in favor of allowing employees to exercise their right to file grievances. *See Anica v. Wal-Mart Stores, Inc.*, 120 Wn. App. 481, 495, 84 P.3d 1231 (2004) (recognizing such a cause of action as a narrow exception to the general rule that employment is terminable at will). This claim rests on the same factual premise as Ms. Sim's retaliation claim and fails for the same reason. As previously explained, L&I initiated discipline prior to Ms. Sim seeking a grievance through her union. There are no facts suggesting L&I's discipline was a reaction to a grievance. *See Martin v. Gonzaga Univ.*, 191 Wn.2d 712, 727, 425 P.3d 837 (2018) (affirming summary judgment where a "paucity of evidence" linked employer's discipline to employee's public-policy-linked conduct).

III.     *Negligent hiring/supervision/failure to train*

Ms. Sim contends L&I breached its duty to hire and retain competent individuals to supervise her by allowing Ms. Sim's supervisors to treat her callously. This claim lacks factual support.

A cause of action against an employer based on negligent hiring, retention, supervision, or failure to train is different from one of vicarious liability. *Evans v. Tacoma Sch. Dist. No. 10*, 195 Wn. App. 25, 47, 380 P.3d 553 (2016). Under these torts, an employer may be held liable for its own negligence in failing to discover and remedy employees' shortcomings, rather than vicariously for the negligence of its employees. *See Haubry*, 106 Wn. App. at 679.

Ms. Sim has not pointed to any facts supporting a claim of negligent hiring or retention. There is no evidence, for example, that L&I failed to perform background checks on employees or that L&I retained employees after being presented with evidence of unfitness. *See Anderson v. Soap Lake Sch. Dist.*, 191 Wn.2d 343, 356-60, 423 P.3d 197 (2018).

Nor is there evidence supporting a claim of negligent training or supervision. A claim against an employer for negligent training or supervision must be based on an employee's tortious conduct occurring outside the scope of their employment. *Id*. at 361.

No. 39013-6-III
*Sim v. Dep't of Labor & Indus.*

Here, Ms. Sim has not shown any of her coworkers or supervisors acted outside the scope

of their job functions when they engaged in allegedly injurious conduct. *See Robel v.*

*Roundup Corp.*, 148 Wn.2d 35, 53, 59 P.3d 611 (2002) (employees do not step outside

the scope of employment merely by engaging in allegedly harassing conduct). Ms. Sim

therefore has not established a basis to hold L&I liable for its own supposed negligence in

hiring and retaining incompetent individuals to supervise her.

IV.     *Intentional infliction of emotional distress*

        Intentional infliction of emotional distress, also known as the tort of outrage,

requires a plaintiff to prove that, in the course of (1) extreme and outrageous conduct, a

defendant (2) intentionally or recklessly inflicted emotional distress, (3) actually resulting

in severe emotional distress to the plaintiff. *Kloepfel v. Bokor*, 149 Wn.2d 192, 195, 66

P.3d 630 (2003).

        Ms. Sim has produced evidence she suffered emotional distress, but the other

elements of her claim are lacking. As set forth above, Ms. Sim has not shown L&I

employees discriminated against her or subjected her to unlawful harassment. While

it was undoubtedly upsetting for Ms. Sim to be fired, there is no evidence L&I's

termination decision was unlawful. Ms. Sim was repeatedly warned her performance

was not up to L&I's standards. Her supervisors and peers provided assistance and

24

opportunities for improvement. L&I's decision to end Ms. Sim's employment was not

extreme or outrageous. Ms. Sim cannot sustain a claim of intentional infliction of

emotional distress.[4]

## CONCLUSION

The order of summary judgment is affirmed. Ms. Sim's request for attorney fees

is denied.

A majority of the panel has determined this opinion will not be printed in

the Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

Pennell, J.

WE CONCUR:

Lawrence-Berrey, A.C.J.                    Staab, J.

---

[4] Ms. Sim also brought a claim for negligent infliction of emotional distress, but has not addressed that claim in her briefing beyond mentioning it in a subheading. The claim is therefore waived and will not be addressed. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).