IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| ROBERT C. SMITH, an individual, | No. 84351-6-I |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| CITY OF SEATTLE, | |
| Respondent. | |

BOWMAN, J. — Over the course of Robert Smith's employment with the Seattle Department of Finance and Administrative Services (FAS), FAS investigated him several times for violating its "Workplace Expectations" (WPEs). FAS issued Smith a written reprimand, a 5-day suspension, and a 15-day suspension. And it declined to give Smith a discretionary pay raise. Smith sued the city of Seattle (City), alleging disparate treatment, retaliation, and negligent supervision by FAS. The trial court dismissed Smith's claims on summary judgment. We reverse the court's order dismissing Smith's disparate treatment claim related to FAS' denial of his pay raise and remand that claim for further proceedings. We otherwise affirm.

FACTS

In June 2016, FAS hired Smith, a Black man, as a janitorial services manager. FAS hired Smith to supervise around 20 people and provide custodial

services to Seattle City Hall (City Hall) and the Department of Corrections Community Justice Center Seattle-King County (CJC).

Written Reprimand

In May 2017, several members of the janitorial staff each submitted a "Letter of No Confidence" to FAS because of Smith's "lack of leadership, mismanagement and poor policy decisions." The staff members alleged that Smith (1) "treated employees less favorably after they complained to or about him, or attended a union [meeting]," (2) "argued with his janitorial lead in the presence of other janitorial staff and behaved unprofessionally," and (3) "was unprofessional towards or in the presence of other staff." Long-time employee Craig McKinney, FAS Facilities Maintenance Day Crew Lead Janitor, also alleged that Smith "treated him differently than other janitorial staff because Smith did not like him." Among other things, McKinney claimed that Smith "flipped him off" with his middle finger during an argument.

FAS Senior Human Resources (HR) Business Partner Megan Baek investigated these and other complaints about Smith. After interviewing employees, including Smith, and reviewing City Hall video footage, Baek found that Smith violated FAS' WPEs by

> (1) denying janitors overtime after they complained about his process for assigning overtime; (2) arguing with McKinney in the presence of other janitorial staff; (3) inappropriately addressing McKinney's safety concern during [an] April staff meeting; (4) giving McKinney the middle finger; (5) arguing with staff; (6) undermining

the lead janitor's authority; and (7) avoiding communication with McKinney.

Still, Baek found several complaints were unsubstantiated or involved conduct that did not violate the WPEs.

On November 9, 2017, Smith's supervisor, FAS Facilities Operations Division Director Mike Ashbrook, recommended that FAS suspend Smith for five days. Ashbrook noted that Smith's "unprofessional behavior has created a negative work environment for the janitorial staff." In December 2017, Smith attended a Loudermill[1] hearing with FAS Director Fred Podesta to discuss the reasons for his actions and dispute the suspension.

On January 25, 2018, Podesta issued his final determination and reduced Ashbrook's suspension recommendation to a written reprimand. But Podesta wanted it to be "clear" that he agreed with Baek's findings and with Ashbrook "on the severity" of Smith's actions. Podesta explained to Smith that the reason for his decision was

> not due to your underlying business reasons or justifications. Instead, the discipline is due to your disrespectful communication style, the manner in which you relay decisions to your employees, your inability to resolve conflict appropriately, and you adding to a negative work environment.

Ashbrook then started meeting with Smith weekly to discuss Smith's management style. In early May 2018, they met to "finalize the results from last year's investigation and help [Smith] reset the job expectations as the manager

---

[1] Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538, 547-48, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) (holding public employees have a property right in continued employment and the state cannot deprive them of that right without due process).

of the janitorial group." Ashbrook offered several resources to Smith and recommended that he seek mentoring from FAS Facilities Maintenance Manager John Sheldon, a long-term employee. Ashbrook also offered Smith a job coach and management training courses by the City.

Five-Day Suspension

On May 29, 2018, FAS Senior HR Business Partner Becky Stover investigated reports by janitors Kevin Nelson and Preston Thomas about Smith and McKinney's continuing misconduct. Nelson alleged that Smith and McKinney discriminated and retaliated against him. Thomas asserted that Smith did not address his complaints that McKinney harassed and bullied him. Stover found that Smith violated the WPEs by yelling at Nelson, insulting him, and confronting him about his attire and by failing to manage Thomas' complaints about McKinney.

Then, in August 2018, Baek investigated a report by a janitorial crew chief that Smith agreed to pay another janitor "one hour overtime each day even if he worked less than one hour." Baek confirmed the allegation was true and found that Smith violated the WPEs because he did not have the authority to pay the janitor more overtime than he actually worked.

On November 15, 2018, Ashbrook recommended a 10-day suspension based on Smith's incidents with Nelson and Thomas. And on January 8, 2019, after a Loudermill hearing, FAS Department Director Calvin Goings issued Smith a 5-day suspension for

> 1) yelling "get off the phone" and "your break is over" at [Nelson]
> who was on the phone with another City employee during his

4

break; 2) making insulting comments to [Nelson], including that you hoped he didn't turn into a "monster" and that he should dress professionally and "not like a homeless person going through the trash"; 3) confronting [Nelson], whom you knew had made a harassment claim against you, about his work attire in a public area of City Hall and escalating the interaction by questioning the employee in a sarcastic and accusatory manner and immediately ordering him to go home; [and] 4) failing to consistently address [Thomas'] repeated complaints about [McKinney's] bullying communication style and behavior.

Goings also based the suspension on Smith "offering to pay overtime to an employee for more than the actual hours worked which resulted in the employee being paid for overtime hours he did not work and him having to repay the overpayment."

Smith's September 2018 Complaint to FAS

In mid-September 2018, Smith became concerned that two of his employees were engaged in a time-theft scheme. According to him, one employee would clock-in at the worksite and allow the second employee, who was not yet at work, to clock-in by phone so that he could receive overtime pay. Smith reported his concerns to Baek and Ashbrook and asked to use video cameras to collect evidence of the employees' misconduct. Baek and Ashbrook escalated the matter to FAS HR Director Andrew Lu.

On September 20, 2018, Lu e-mailed Smith that there would be no video investigation and that Smith should talk to the employees directly. Soon after, Lu explained to Smith that he did not want to investigate the employees because they were " 'entirely [B]lack' " and " 'the optics of it wouldn't look good.' " In early 2019, Smith complained about Lu's conduct to the Seattle City Attorney's Office. On June 12, 2019, an investigator with the City's Anti-Harassment Inter-

5

departmental Team issued a report, concluding that while "Lu was within his managerial rights when he denied the use of the video data," his response in the matter "was inappropriate, inconsistent with the usual practice and based at least in part on the ethnicity of the employees involved."

Fifteen-Day Suspension

On May 29, 2019, McKinney alleged that as he was leaving the building to begin serving a disciplinary suspension, Smith yelled at him, " 'Enjoy your [10] days off unpaid.' " In an August 2019 investigative report, Baek concluded that more likely than not, Smith made the comment in violation of the WPEs. Baek encouraged Smith and McKinney to engage in "restorative conversation."

Then, in October 2019, Smith and McKinney independently e-mailed Sheldon[2] about an argument they had at City Hall. Each maintained that the other told him to " 'fuck off' " after McKinney confronted Smith about operating a floor scrubbing machine. Smith complained that " 'this behavior has continued for [three years] with no changes despite attempts by Administrative staff and [HR] to correct them. I am officially once again filing Harassment charges against . . . McKinney." Sheldon referred his complaint to FAS HR.

On January 28, 2020, the HR investigator found that "Smith and McKinney acknowledged they made provocative remarks to one another" and that a video of the incident "revealed they both displayed conduct that could reasonably be

---

[2] By May 2019, FAS had assigned Sheldon as supervisor of the janitorial services unit. Sheldon supervised both Smith and McKinney, and Smith was "expected to take [issues with McKinney] to Sheldon to be dealt with."

viewed as aggressive." The investigator also concluded that while McKinney "instigated the confrontation," Smith's response violated FAS' WPEs.

Meanwhile, McKinney complained to FAS HR that on January 22 and 23, 2020, Smith inappropriately assigned another employee one of McKinney's lead janitorial duties of training a new janitor. On March 31, 2020, FAS Employee and Labor Relations Manager Ray Sugarman, who was also the FAS Interim HR Manager at the time, concluded that Smith's conduct violated the WPEs. Then, in April, Sugarman addressed another report that Smith was rude to a City Hall staff member and inappropriately provided her with a potentially harmful cleaning chemical "instead of addressing her concerns."[3] Sugarman concluded that Smith's conduct violated FAS' WPEs.

Based on these WPE violations, Ashbrook recommended that Smith receive a 15-day suspension. And on May 27, 2020, after a Loudermill hearing, Goings issued the recommended 15-day suspension, agreeing with the findings of the FAS HR investigator and Sugarman. Goings noted, "You have engaged in a pattern of similar behavior in the past and your failure to improve is concerning."

On June 12, 2020, Smith filed a grievance with the City, alleging that FAS unfairly suspended him. Smith argued that the evidence presented did not support his suspension. On September 11, 2020, Goings issued a letter upholding the 15-day suspension.

---

[3] Sugarman also found that the chemical "was not being stored properly and . . . was flammable."

Smith's 2021 Lawsuit

On September 14, 2020, Smith filed a disciplinary appeal with the City's Civil Service Commission (CSC).  Then, on December 4, 2020, he filed a claim for damages with the City for "[e]conomic losses due to suspension" and "[e]motional distress damages."[4]  And on March 23, 2021, Smith sued the City in King County Superior Court, alleging retaliation for his September 2018 complaint against Lu, retaliation for exercising his First Amendment[5] right to free speech, and negligent supervision of Ashbrook, Lu, McKinney, and Sheldon.

FAS Denies Smith a Pay Raise

On October 27, 2021, Smith's supervisor, FAS Logistics and Emergency Management Division Director Philip Saunders, recommended Smith and another manager from FAS Mail and Distribution Services recieve a pay raise.  FAS considers raises at the end of each calendar year under a "discretionary pay program" that bases the raise on whether the manager's job duties expanded, they had progressed in their job's learning curve, and their salary was internally aligned.

FAS denied Smith's raise.  The decision-making committee determined that "Smith's duties had not significantly expanded, that he had recent, serious discipline, and that as a result he had room to grow on his managerial learning curve."  FAS gave the other manager a pay raise.

---

[4] Smith withdrew his appeal with the CSC in February 2021.

[5] U.S. CONST. amend I.

Amended Complaint and Summary Judgment Dismissal

On March 11, 2022, Smith amended his complaint to add a claim for disparate treatment related to his suspensions and FAS' refusal to give him a raise. He also clarified his First Amendment claim, alleging FAS retaliated against him for speaking out against Lu.

On June 17, 2022, FAS moved for summary judgment, arguing that Smith failed to show it violated the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW. On July 15, the court granted FAS' motion for summary judgment and dismissed Smith's claims with prejudice.

Smith appeals.

ANALYSIS

Smith argues the trial court erred by dismissing his WLAD lawsuit on summary judgment.

We review a trial court's grant of summary judgment de novo. Kim v. Lakeside Adult Fam. Home, 185 Wn.2d 532, 547, 374 P.3d 121 (2016). Summary judgment is appropriate when, viewing all facts and reasonable inferences in a light most favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 164, 273 P.3d 965 (2012); Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008); CR 56(c). A genuine issue of material fact exists where reasonable minds could differ on the facts controlling the outcome of the litigation. Ranger, 164 Wn.2d at 552.

The purpose of the WLAD is to deter and eradicate discrimination in Washington. Fraternal Ord. of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Ord. of Eagles, 148 Wn.2d 224, 246, 59 P.3d 655 (2002). We construe the WLAD liberally to accomplishment that purpose. W.H. v. Olympia Sch. Dist., 195 Wn.2d 779, 784, 465 P.3d 322 (2020); RCW 49.60.020. Summary judgment for an employer is seldom appropriate in WLAD cases because of the difficulty of proving a discriminatory motivation. Scrivener v. Clark Coll., 181 Wn.2d 439, 445, 334 P.3d 541 (2014). But summary judgment for the employer is proper if the

> "record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the [employee] created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."

Becker v. Wash. State Univ., 165 Wn. App. 235, 252-53, 266 P.3d 893 (2011)[6] (quoting Milligan v. Thompson, 110 Wn. App. 628, 637, 42 P.3d 418 (2002)).

When evaluating the merits of WLAD claims, we employ the McDonnell Douglas[7] burden-shifting framework. Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County, 189 Wn.2d 516, 526, 404 P.3d 464 (2017). This framework involves three steps. First, the employee must establish a prima facie case of discrimination. Marquis v. City of Spokane, 130 Wn.2d 97, 113, 922 P.2d 43 (1996). An employee can do this by showing they are a member of a protected class and the employer acted adversely toward them. See Id. at 113-14.

---

[6] Internal quotation marks omitted.

[7] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Next, the employer may rebut the prima facie case by presenting evidence of a legitimate, nondiscriminatory reason for the adverse action. Marquis, 130 Wn.2d at 114. The employer carries a burden of production and " 'need not persuade the court that it was actually motivated by the proffered reasons.' " Mikkelsen, 189 Wn.2d at 533 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). "The employer need only introduce 'evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.' " Id. (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).

Finally, even if the employer shows a nondiscriminatory reason for the adverse action, the employee may survive summary judgment by showing that the proffered nondiscriminatory reason amounts to pretext. Scrivener, 181 Wn.2d at 441-42. "The employee shows pretext if the proffered justifications have no basis in fact, are unreasonable grounds upon which to base the [adverse action], or were not motivating factors in employment decisions for other similarly-situated employees." Griffith v. Schnitzer Steel Indus., Inc., 128 Wn. App. 438, 447, 115 P.3d 1065 (2005).

Smith argues the trial court erred by dismissing his claims for disparate treatment, retaliation, and negligent supervision. We address each claim in turn.

1.  Disparate Treatment

Smith argues the trial court erred by dismissing his disparate treatment claims because "he produced circumstantial evidence of disparate treatment based on race."

To establish a prima facie case of racial discrimination based on disparate treatment, a plaintiff must show that they (1) belong to a protected class, (2) was treated less favorably in the terms or conditions of their employment (3) than a similarly situated, nonprotected employee, and (4) the nonprotected "comparator" employee does substantially the same work. Washington v. Boeing Co., 105 Wn. App. 1, 13, 19 P.3d 1041 (2000) (quoting Johnson v. Dep't of Soc. & Health Servs., 80 Wn. App. 212, 227, 907 P.2d 1223 (1996)), abrogated on other grounds by Washington v. Horning Brothers, LLC, 339 F. Supp. 3d 1106 (E.D. Wash. 2018).

A.  Disparate Discipline

Smith asserts he was disciplined differently than other employees based on his race.  He uses Sheldon, a white manager, as a comparator.  Smith argues that Sheldon also faced complaints but FAS punished him less harshly than Smith.  The record does not support Smith's argument.

In January 2019, FAS investigated Sheldon after a female employee alleged he treated her differently than male employees by scrutinizing her overtime requests, assigning her to a different worksite, making inappropriate comments, and seeking out complaints about her from other crew members. FAS HR Manager Andrea Sheele investigated the allegations and concluded that

12

Sheldon violated the WPEs by failing to directly address performance concerns with the employee and coming across as "angry and demeaning" toward her. She determined that the other allegations were unsubstantiated. Scheele recommended that Sheldon "receive coaching and training regarding his communication style" and have a "restorative discussion" with the employee.[8]

Unlike Sheldon, FAS disciplined Smith after receiving several complaints about his conduct for years. FAS first issued Smith a written reprimand in 2017 after finding he violated several WPEs, including arguing with McKinney in front other janitorial staff, singling him out during a safety meeting, giving him the "middle finger," making statements to other staff to undermine his authority, and avoiding communication with him. FAS then suspended Smith for five days in 2018 after he continued to violate the WPEs, including harassing and insulting Nelson, failing to address complaints about McKinney, and paying a janitor overtime for hours he did not work.

And finally, FAS issued Smith's 15-day suspension in 2019 because he continued to violate the WPEs. Smith inappropriately responded to a verbal altercation with McKinney, assigned McKinney's work to another janitor, and was

---

[8] Smith offers several other incidents of Sheldon's conduct that are either unsupported by the record or not comparable. For example, he argues FAS treated Sheldon favorably by choosing not to follow up on an allegation that Sheldon made an inappropriate comment about an employee's age. But the record shows that FAS decided not to investigate the incident after reaching out to the employee with no response. Smith also points to a complaint he made to Baek, alleging Sheldon was "disrespectful and angry to him in e[-]mail communication" in March 2020. But these e-mails occurred after Sheldon became Smith's supervisor, so Sheldon and Smith were not similarly situated employees at the time. And Smith argues that two unions complained that Sheldon violated a collective bargaining agreement. But the record shows that while the unions directed their grievances to Sheldon, he was not the subject of the unions' complaints. We do not consider these incidents in our analysis.

rude to a City Hall staff member and provided her with a potentially harmful

cleaning chemical. In issuing the 15-day suspension, Goings noted Smith's

frequent behavioral issues, stating:

> You have engaged in a pattern of similar behavior in the past and your failure to improve is concerning. On January 14, 2019, you received a [5]-day suspension for disrespectful communications with subordinates and failure to follow labor contract provisions regarding pay. On January 25, 2018, you received a Written Reprimand specifically for your conduct with Mr. McKinney including arguing with him in front of staff and in public places, making disrespectful comments to him, and giving him the middle finger. You also violated contract provisions regarding pay and assigning of overtime.

Smith's misconduct is not similar to Sheldon's and Smith faced

increasingly harsher discipline because he continued to violate the WPEs over

the years. As a result, Smith fails to show a prima facie case of racial

discrimination by disparate disciplinary treatment under the WLAD.

B. Disparate Denial of Pay Raise

Smith also argues that he showed sufficient evidence to survive summary

judgment that FAS denied him a pay raise based on his race. We agree.

The parties do not dispute that Smith is a member of a protected class.

And the record shows that FAS Mail and Distribution Services Manager Daniel

Brown was a similarly situated white manager, was doing substantially the same

work as Smith, and he received a year-end pay raise while Smith did not.

In response, FAS offers a legitimate, nondiscriminatory reason for the

adverse action. FAS showed that the City uses pre-established criteria in

determining which employees will receive a year-end raise. Those criteria

include "1) whether a manager's job duties expanded or the manager was

assigned a new function; 2) whether the manager had progressed along their job's learning curve; and 3) whether the manager's salary was properly internally aligned."

Brown achieved those criteria. In 2020 and 2021, his job duties expanded to include overseeing "WebEOC," the City's online portal for ordering items related to the COVID-19 pandemic. Brown coordinated with FAS' warehouse to fill and deliver those orders. And he "was further along on his managerial learning curve, due in part to his ability to effectively lead his staff as well as his lack of discipline or complaints from his subordinates." But FAS concluded Smith's "duties had not significantly expanded," he had "recent, serious discipline," and, as a result, "he had room to grow on his managerial learning curve."

Smith asserts FAS' reasons for denying his raise are pretextual because Saunders recommended he receive a raise. Indeed, Saunders recommended both Smith and Brown for pay raises. In doing so, Saunders noted that FAS expanded Smith's job duties by adding "Enhanced Covid Cleanings"; snow removal at the Seattle Municipal Tower, CJC, and SeaPark Garage; and an "Egress Plan" that required new training.

Smith offers sufficient evidence to create an issue of fact as to whether FAS proffered legitimate reasons for denying his pay raise. As a result, we reverse the court's order dismissing Smith's disparate treatment claim related to FAS' denial of his pay raise and remand for further proceedings on that claim.

2. Retaliation

Smith claims that FAS disciplined him and denied his pay raise in retaliation for reporting Lu to the City. He argues that the trial court erred by dismissing those claims at summary judgment. We disagree.

The WLAD shields employees engaged in statutorily protected activity from retaliation by their employer. RCW 49.60.210; Lodis v. Corbis Holdings, Inc., 172 Wn. App. 835, 847, 292 P.3d 779 (2013). Specifically, "[i]t is an unfair practice for any employer . . . to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by [the WLAD]." RCW 49.60.210(1).

To establish a prima facie case of retaliation, an employee must first show they took a statutorily protected action. Cornwell v. Microsoft Corp., 192 Wn.2d 403, 411, 430 P.3d 229 (2018). Reporting a potential violation of the WLAD is a statutorily protected activity. Davis v. W. One Auto. Grp., 140 Wn. App. 449, 460, 166 P.3d 807 (2007). An employee need not show that their employer's behavior actually violated the WLAD. Estevez v. Faculty Club of Univ. of Wash., 129 Wn. App. 774, 798, 120 P.3d 579 (2005). Instead, an employee need prove only that they opposed conduct that was "at least arguably a violation of the law." Kahn v. Salerno, 90 Wn. App. 110, 130, 951 P.2d 321 (1998).

Next, the employee must show they suffered an adverse employment action. Cornwell, 192 Wn.2d at 411. Finally, the employee must show there is a causal link between the protected activity and the adverse employment action. Id. To prove causation, an employee must show that retaliation was a

substantial motivating factor in the adverse employment action. Id. at 412.

Retaliation need not be the main reason for the employment action. Currier v. Northland Servs., Inc., 182 Wn. App. 733, 746, 332 P.3d 1006 (2014). " 'Because employers rarely will reveal they are motivated by retaliation, [employees] ordinarily must resort to circumstantial evidence to demonstrate retaliatory purpose.' " Id. at 746-47[9] (quoting Estevez, 129 Wn. App. at 799).

We may infer causation by looking at the " 'proximity in time between the protected action and the allegedly retaliatory employment decision.' " Cornwell, 192 Wn.2d at 415-16[10] (quoting Raad v. Fairbanks N. Star Borough Sch. Dist., 323 F.3d 1185, 1197 (9th Cir. 2003)). "If the employer knows of the protected activity and the [adverse employment action] follows 'shortly thereafter, it is a reasonable inference that these actions were in retaliation' for the activity." Mackey v. Home Depot USA, Inc., 12 Wn. App. 2d 557, 577, 459 P.3d 371 (2020) (quoting Cornwell, 192 Wn.2d at 415-16). We determine case-by-case whether proximity in time gives rise to an inference of retaliation. See, e.g., Id. (termination 12 days after complaint sufficient to show prima facie case of retaliation); Cornwell, 192 Wn.2d at 416 n.10 (termination "a few months" after employer learned of employee's lawsuit "brief enough to give rise to a reasonable inference of retaliatory motive"); Estevez, 129 Wn. App. at 799-800 (termination 9 days after complaint sufficient to show prima facie case of discrimination); but see, e.g., Anica v. Wal-Mart Stores, Inc., 120 Wn. App. 481, 489, 84 P.3d 1231

_____

[9] Internal quotation marks omitted.

[10] Internal quotation marks omitted.

17

(2004) (more than 2 months between injury and termination insufficient to show prima facie case of disability discrimination); Francom v. Costco Wholesale Corp., 98 Wn. App. 845, 863, 991 P.2d 1182 (2000) (15 months between complaint and change in work schedule insufficient to show retaliation).

At the summary judgment stage, the employee's burden is one of production, not persuasion. Cornwell, 192 Wn.2d at 412. So, "to avoid summary judgment on causation, the employee must show only that a reasonable jury could find that retaliation was a substantial factor in the adverse employment decision." Id. at 412-13. To show this, an employee may rely on the fact that (1) they took a protected action, (2) the employer knew about the action, and (3) the employer subjected the employee to an adverse employment action. Id. at 413 (citing Wilmot v. Kaiser Alum. & Chem. Corp., 118 Wn.2d 46, 69, 821 P.2d 18 (1991)).

A. Suspensions

Smith alleges FAS issued his 5- and 15-day suspensions in retaliation for his September 2018 report that Lu refused to investigate two Black employees, a statutorily protected activity.[11] He argues that both of FAS' adverse employment actions were sufficiently close enough in time to the protected activity to give rise to a reasonable inference that his report to HR motivated FAS to suspend him.[12] But even if Smith's argument had merit, FAS offers legitimate reasons for its

---

[11] At oral argument, Smith conceded that his September 2018 complaint about Lu is the only statutorily protected activity from which he alleges retaliatory suspensions on appeal. Wash. Court of Appeals oral argument, Smith v. City of Seattle, No. 84351-6-I (July 20, 2023), at 20 min., 55 sec. to 21 min., 50 sec. (on file with court).

[12] The parties do not dispute on appeal that FAS was aware of Smith's report about Lu at the time it issued each suspension.

adverse employment actions, and Smith fails to show that those reasons are pretextual.

As discussed above, FAS' investigations determined Smith violated FAS' WPEs several times, warranting disciplinary action. And FAS upheld each disciplinary action after Smith had the opportunity to explain his actions at a Loudermill hearing. Still, Smith argues that FAS' reasons for his 5-day suspension in January 2019 are pretextual because the "harsh discipline decision . . . did not fit the alleged misconduct." And he asserts FAS' reasons for his 15-day suspension in May 2020 are pretextual because of the temporal proximity between his discipline and the January 2019 Loudermill hearing.

But Smith offers no evidence that FAS departed from its policies and procedures in discipling him. And in evaluating temporal proximity, the protected activity at issue is Smith's September 2018 complaint about Lu, not the subsequent Loudermill hearing. Even so, while temporal proximity may be sufficient to show a prima facie case of discrimination, the burden at the pretext stage requires more than temporal proximity alone. See Mackey, 12 Wn. App. 2d 585 (fact alone that employer terminated employee 12 days after her complaint insufficient to create pretext for retaliation).

Because Smith cannot show FAS' legitimate reasons for suspending him amount to pretext, the trial court did not err by dismissing Smith's retaliation claims at summary judgment.

19

B. Denial of Pay Raise

Smith also argues that FAS denied him a pay raise in retaliation for filing his discrimination lawsuit. Filling a lawsuit alleging discrimination is a protected activity under the WLAD. RCW 49.60.210(1).

Smith filed his complaint in March 2021. FAS denied Smith a pay raise in December 2021, nine months after the protected activity. Smith asks us to infer that his lawsuit was a motivating factor in FAS denying his pay raise based on the temporal proximity of the two acts. But Smith continued to work for FAS throughout the nine months and alleges no other acts of retaliation for filing the lawsuit. And he makes no effort to explain why, under these circumstances, the temporal proximity between his lawsuit and the adverse employment action gives rise to an inference of causation.

Because Smith shows no evidence that his lawsuit was a motivating factor in FAS' decision to deny his pay raise, the trial court did not err by dismissing Smith's retaliation claims at summary judgment.[13]

3. Negligent Supervision

Smith argues the trial court erred by dismissing his negligent supervision claim. We disagree.

---

[13] Smith also argues that his report of Lu's misconduct amounts to an exercise of his First Amendment rights and that FAS retaliated against him for exercising those rights. Smith is incorrect. An employee engages in constitutionally protected speech when they speak on a matter of public concern as a public citizen while acting outside the scope of their official duties. Karl v. City of Mountlake Terrace, 678 F.3d 1062, 1068 (9th Cir. 2012). Smith made his report within the scope of his official duties. Even so, Smith's First Amendment retaliation claim also fails for the same reasons discussed above.

To show negligence, an employee must establish the employer owed them a duty, breached that duty, and the breach proximately caused injury. Hertog ex rel. S.A.H. v. City of Seattle, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). An employer negligently supervises an employee when (1) the employee acts outside the scope of their employment; (2) the employee presents a risk of harm to other employees; (3) the employer knows, or should have known in the exercise of reasonable care, that the employee posed a risk to others; and (4) the employer's failure to supervise proximately caused injury to other employees. Niece v. Elmview Grp. Home, 131 Wn.2d 39, 48-49, 929 P.2d 420 (1997). A plaintiff must base a claim of negligent supervision on tortious or wrongful conduct. Haubry v. Snow, 106 Wn. App. 666, 679, 31 P.3d 1186 (2001).

Smith argues the City negligently supervised McKinney[14] by failing to control his tortious conduct, "including verbal assault, theft, and threatening physical gestures" against Smith. But, even assuming this was so, Smith fails to show that McKinney's conduct injured him.

Smith alleged below that McKinney's behavior led to several "verbal and physical attacks during his employment as well as numerous unwarranted suspensions and reprimands which resulted in a loss of income." But he offers no evidence that McKinney's conduct caused Smith's suspensions and reprimands. And as much as Smith suggests he suffered emotional distress,[15]

---

[14] While Smith's complaint alleged negligent supervision of Ashbrook, Lu, McKinney, and Sheldon, he argues negligent supervision of only McKinney on appeal.

[15] Smith's complaint alleged that FAS' failure to supervise McKinney "caused intense personal harm . . . by subjecting him to repeated harassment [and a] hostile work environment."

such a claim requires Smith to "establish that the emotional distress is manifested by objective symptoms." Haubry, 106 Wn. App. at 678. Smith offers no such evidence.

The trial court did not err by dismissing Smith's negligent supervision claim.

We reverse the court's order dismissing Smith's disparate treatment claim related to FAS' denial of his pay raise and remand that claim for further proceedings. We otherwise affirm.

_Bruman, J._

WE CONCUR:

_Hazelrigg, ACJ_          _Dwyer, J._